**Efrain RIVERA–VEGA, Acting Regional Director for Region 24 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,**

v.

**CONAGRA, INC. and/or ConAgra Grain Processing Companies, Inc. and Molinos de Puerto Rico, Inc., Respondents.**

Civ. No. 94–1798–DRD.

United States District Court,
D. Puerto Rico.

Feb. 10, 1995.

Antonio F. Santos–Bayron, N.L.R.B. Region 24, Hato Rey, PR, for petitioner.

Roger J. Miller, McGrath, North, Mullin & Kratz, P.C., Omaha, NE, for respondent ConAgra, Inc.

Angel Munoz–Noya, Lespier & Munoz–Noya, San Juan, PR, for respondent Molinos de Puerto Rico, Inc.

## OPINION AND ORDER

DOMINGUEZ, District Judge.

This proceeding is before the Court upon a petition for injunctive relief filed on June 10, 1994 by the Acting Regional Director of Region 24 of the National Labor Relations Board ("the Board"), pursuant to Section 10(j) of the National Labor Relations Act, as amended (61 Stat. 149; 29 U.S.C. Sec. 160(j) ("the Act"). The injunctive relief herein requested, if granted, is to be on effect until the final disposition of matters pending before the Board on a charge and amended charges filed by Congreso de Uniones Industriales de Puerto Rico ("the Union"). The Union alleges that ConAgra, Inc. and/or ConAgra Grain Processing Companies ("ConAgra") and Molinos de Puerto Rico, Inc. ("Molinos") and both collectively referred to as Respondents), have engaged in, and are engaging in, unfair labor practices within the meaning of Section 8(a)(1), (3) and (5) of the Act, which section prohibits an employer from interfering with, restraining or coercing employees in the exercise of their right to engage in union and/or concerted activities; from discriminating against employees because of their membership in a labor organization; and from failing or refusing to bargain collectively in good faith with the representative of its employees in an appropriate unit.[1]

A hearing on the Regional Director's petition was held on June 24, 1994. The parties agreed to submit this case on the transcript and exhibits presented at the administrative hearing before an Administrative Law Judge (ALJ) of the Board and on supplemental affidavits submitted to the Court.

In essence, the Regional Director alleges that Respondent has incurred in a refusal to bargain by adhering to proposals that were "predictably unacceptable" to the Union; by refusing to provide properly requested financial and sales information; by declaring a fictitious impasse followed by effectuating unilateral changes to terms and conditions of employment, and finally by imposing a lockout on its employees in order to compel the acceptance of its bargaining position and by replacing employees with temporary employees.

Upon consideration of the pleadings, evidence, and memoranda[2] filed by the parties, the Court is ready to rule.

### I. The 10(j) Applicable Standards

Under Section 10(j) of the Act, federal courts are empowered to grant injunctions pending the Board's resolution of unfair labor practice proceedings. This provision reflects the Congressional recognition that, because the Board's administrative proceedings often are protracted, absent interim relief, a respondent may accomplish unlawful objectives before being placed under legal restraint, thereby rendering a final Board order ineffective. See *Fuchs v. Hood Industries, Inc.*, 590 F.2d 395, 396 (1st Cir.1979), citing S.Rep. No. 105, 80th Cong., 1st Sess., at pp. 8, 27 (1947), reprinted at *I Legislative History of the Labor Management Relations Act of 1947*, 414, 433 (Government Printing

1. The charge in 24–CA–6856 was filed by the Union on December 2, 1993. It was subsequently amended on December 27, 1993, January 3, 1994, January 31, 1994 and March 25, 1994. The charge in 24–CA–6881 was filed by Union on February 8, 1994, and was amended on March 25, 1994. Following its investigation of the charges, the Board issued an Order Consolidating Cases, Consolidated Amended Complaint, and Notice of Hearing on or about March 25, 1994 alleging that the Respondents, as joint employers, violated Sections 8(a)(1), (3) and (5) of the National Labor Relations Act, (the "Act"), 29 U.S.C. Sec. 158(a)(1), (3). Respondents filed a

timely Answer to the Consolidated Complaint admitting the jurisdictional pleading but denying any violation of the Act. Thereafter, a hearing was held before Administrative Law Judge A. Pacht in San Juan, Puerto Rico from May 9 to 13, 1994. The ALJ's decision is pending.

2. The case was assigned to the undersigned Judge on November 18, 1994. On December 16, 1994 the Court by agreement of both parties granted each of them until January 11, 1995 to file a proposed Opinion and Order.

Office 1985). Thus, Section 10(j) was intended to prevent the potential frustration or nullification of the Board's remedial authority caused by the passage of time inherent in Board administrative litigation. See, e.g. *Asseo v. Centro Médico Del Turabo, Inc.*, 900 F.2d 445, 454 (1st Cir.1990); *Angle v. Sacks*, 382 F.2d 655, 660 (10th Cir.1967).

In addressing a 10(j) petition, a district court must focus on two issues: (1) whether there is "reasonable cause to believe" that a respondent has violated the Act, and (2) whether temporary injunctive relief is "just and proper". See, e.g. *Asseo v. Centro Médico Del Turabo, Inc.*, 900 F.2d at 450; *Asseo v. Pan American Grain Co.*, 805 F.2d 23, 25 (1st Cir.1986). The district court is not authorized to decide whether an unfair labor practice actually occurred. *Asseo v. Centro Médico Del Turabo*, 900 F.2d at 450.

In determining whether there is reasonable cause to believe that the Act has been violated, the district court only needs to find that the Board's position is "fairly supported by the evidence." See *NLRB v. Sullivan Brothers Printers, Inc.*, 38 F.3d 58 (1st Cir.1994); *Asseo v. Centro Médico Del Turabo, Inc.*, 900 F.2d at 450; *Maram v. Universidad Interamericana de Puerto Rico, Inc.*, 722 F.2d 953, 958–959 (1st Cir.1983); *Asseo v. Pan American Grain Co., Inc.*, 805 F.2d 23, 25 (1st Cir.1986). The district court should not resolve contested factual issues and should defer to the Regional Director's version of the facts if it is "within the range of rationality". *Maram v. Universidad Interamericana*, 722 F.2d at 958. Accord: *Fuchs v. Hood Industries*, 590 F.2d at 397. However, district courts must not yield too facile deference to the Regional Director's injunctive prayers diluting the extraordinary nature of the relief and ushering concerns that "courts not be routinely deprived of the expertise which would be available to them in reviewing the Board's holdings and enforcement proceedings". *McLeod v. General Electric* 257 F.Supp. 690 (S.D.N.Y.), rev'd 366 F.2d 847, 850 (2d Cir.1966). As noted in *Boire v. Pilot Freight Carriers, Inc.*, 515

F.2d 1185, 1193 (5th Cir.1975), "the [judge] does not abdicate his power merely upon a showing that the Regional Director's theories surpass frivolity. He maintains some power to do equity and mold each decree to the necessities of the case". *Minnesota Mining & Manufacturing Co. v. Meter*, 385 F.2d 265 (8th Cir.1967); *Arlook v. S. Lichtenberg & Co.*, 952 F.2d 367 (11th Cir.1992). Therefore, the deference due to the Regional Director is not "unfettered". *Asseo v. Centro Médico Del Turabo, Inc.*, supra.

Interim injunctive relief is "just and proper" to preserve and restore the status quo "when the circumstances of a case create a reasonable apprehension that the efficacy of the Board's final order may be nullified, or the administrative procedures will be rendered meaningless". *Asseo v. Centro Médico Del Turabo, Inc.*, 900 F.2d at 455 quoting *Angle v. Sacks*, 382 F.2d at 660.

In the First Circuit jurisdiction, District courts must examine "the whole panoply of discretionary issues with respect to granting preliminary injunctive relief." *Asseo v. Centro Médico Del Turabo*, 900 F.2d at 454; *Asseo v. Pan American Grain Co.*, 805 F.2d at 26. Under those standards relief is appropriate if: (1) petitioner has exhibited a likelihood of success on the merits [3]; (2) the petitioner will suffer irreparable injury if the injunction is not granted; (3) such injury outweighs any harm which granting injunctive relief would inflict on the respondent; and (4) the public interest will not be adversely affected by granting the injunction. *Asseo v. Centro Médico Del Turabo, Inc.*, at 453; *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 5 (1st Cir.1991); *Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981).

Thus, in ultimately resolving the Board's 10(j) petitions the courts are not "a rubber stamp" of the [NLRB] Director. *Maram v. Universidad Interamericana, supra*, at 958. In the district court's efforts to preserve the status quo, the court should grant only that relief which is reasonably

---

**3.** "When, the interim relief sought by the Board is essentially the final relief sought, the likelihood of successes should be strong". (*NLRB*

*v. Sullivan Brothers*, 38 F.3d 58, 63 (1st Cir. 1994), quoting *Pan American Grain Co.*, 805 F.2d at 29).

necessary to preserve the remedial powers of the NLRB.

## II. Findings of Fact

### A. Background and Bargaining History

We examine the evidence presented by the Regional Director to determine compliance with the standard of "within the range of rationality". *Maram v. Universidad Interamericana,* 722 F.2d at 958.[4] The Court finds the following facts "fairly supported" by the record.

Respondent Molinos, is a wholly owned subsidiary of Respondent ConAgra. Respondent Molinos' production and maintenance employees have been represented by the Union for over 20 years. During this period the parties have entered into eight collective bargaining agreements ("CBA"). During these past eight labor negotiations, until the labor negotiations of 1993–1994, the Union has not called a strike and the Company has not implemented a lock-out. The last CBA between the parties was signed on January 31, 1990, and was to be effective until October 28, 1993.[5]

### B. Bargaining Sessions

A review of the bargaining minutes submitted in evidence discloses the following:

The parties began negotiations for a new CBA on June 17. Fernando Espinosa, Respondent Molinos' Director of Human Resources was the spokesperson for the Respondents, Ray Godbout, Respondent ConAgra's Vice–President of Human Resources, and Fred Lange, Respondent's Molinos General Manager, appeared and spoke for the Respondents at various meetings. Human Resources manager Elba Delgado drafted the minutes for most meetings. Arturo Figueroa was the spokesperson for the Union. Twenty two sessions were scheduled from June 17 to October 27. Four were canceled. The parties had 18 labor negotiations sessions.

At the first meeting, Fred Lange explained the changes that had occurred in the corporate structure of Respondent Molinos. Lange informed the Union that Respondent Molinos had became part of more than 60 companies that belong to what is known as ConAgra Grain Processing Company. Lange informed the Union that henceforth Respondent Molinos was going to be evaluated in a different way from what it had been in the past; that it was going to be compared against the other 60 ConAgra companies and not against the results of other unrelated companies on the island. Lange spoke about the need for Respondent Molinos to become competitive and how it was essential for the Union to understand this. Lange added that Respondent Molinos had to make significant changes if they wanted to be there in the future. He told the Union representatives that if Molinos did not take immediate measures there was the probability that they were not going to be there in the future. Lange informed the Union that its business was at a critical point, that it was losing sales and market share. To substantiate his position, Lange presented a graph which reflected that Respondent Molinos had lost 20% of the market share in the flour business and had recently lost its largest customer and its largest distributor. Lange further suggested that Respondents were considering to bring the flour directly from the United States, rather than milling the same in Puerto Rico. Regarding the animal feed business, Lange explained that it also had lost considerable market share and sales volume in the recent months. Lange went on to present a competitive analysis of several companies in Puerto Rico. After that part of the presentation, Lange went on to explain the negative effects of other matters upon Respondent Molinos. He spoke about the potential changes to the federal tax exemptions under Section 936 of the Internal Revenue Code and their plausible negative impact on the company. He also spoke about the effects of NAFTA upon the Respondent's business and about how state taxes might adversely affect the business. Lange finished his presentation by telling the Union

---

4. Some circuits examine the facts "in the light most favorable to the Board". *Arlook v. S. Lichtenberg & Co., supra,* at 371.

5. All dates refer to the year 1993, unless otherwise stated.

that Respondent Molinos could not continue in business in Puerto Rico if it was not competitive and that companies that are not competitive could not survive. At the end of this first meeting, Espinosa stated the following: "faced with our company's difficult situation we are going to present our proposal". Respondents then gave the Union their complete proposal for a new CBA. Said proposal called for a reduction of wages and benefits from an hourly average of $17.84 to $11.11 per hour.

At the second meeting, on June 22, the Union reacted to Respondents' first proposal stating that it believed Respondents were bargaining in bad faith by presenting a regressive proposals that was considered disrespectful and below that of Respondent's competitors.[6] The Union mentioned, for example, that Respondents' proposal included a provision that the Christmas bonus be reduced from 8.5% to 2%. The Union then handed its proposal to Respondents. Respondents reiterated that their proposal reflected the need to become competitive and stated that if it was not competitive it could not survive. The Union replied that if Respondents insisted on such a radical proposal it would take it to the employees. Respondents insisted on the need to become competitive; Respondents' spokesman responded:

"The situation is a serious one and fragile. Because of that we wanted to emphasize more volume and sales losses. The Company is affected in the measure of a loss in sales volume and increase our costs. If you do not fill expectations since you are a very, very small part of ConAgra's operations, why should ConAgra care about the operation. If it does not matter to the membership that a lock be placed on it, ... We are trying to make the organization competitive and that can survive with that competition that operates with a lot less employees and low operational costs".

The parties then began discussing those sections of Respondents' proposal indicating on what sections they agreed.

At the third meeting, on June 24, the parties continued discussing Respondent's proposal, the Union agreeing on some provisions, disagreeing on most. The parties continued discussing non-economic matters until the thirteenth meeting on August 31.[7]

At the twelfth meeting, on August 24, Respondents discussed, among other matters, a management proposal to eliminate providing the employees with a bar of soap (Article XV, Section 1). Union committee members laughed and Espinosa stated "things like this are what make us not be competitive and can make us have to close shop because we cannot compete".[8]

The fourteenth meeting was canceled.

At the fifteenth meeting, on September 14, the parties started to bargain over economic matters. Respondents submitted a comparative graph on hourly costs of Molinos versus other companies showing an asserted competitive weakness (the same graph originally presented by Lange at the first meeting). Respondents read each economic section from its original proposal, all calling for decreases, but the Union did not agree to any of them. Espinosa once again spoke of com-

6. The average hourly wage and benefit for Harinas de Puerto Rico and Pro Grano, two of Respondent Molinos' competitors in Puerto Rico was at that time $13.76.

7. At the fourth meeting held on June 29, 1993 the parties agreed upon the following articles: Seniority, Art. XII; Bulletin Board, Art. XIV; Union Rights, Art. XX; Complete Agreement, Art. XXX; Limitations, Art. XXXV. The fifth and sixth meetings were canceled by the Union due to illness and the other due to misunderstanding as to date. At the seventh meeting held on July 10, 1993 the parties discussed article IV Grievance Procedure, Section 13 dealing with prior notice before suspension or termination of employment. No agreement was reached. At the eighth meeting held on July 27, 1993 the parties continued discussing without reaching agreement as to Article IV, Section 13 and Article XII, Section 6 on posting of notices for vacancies. On the ninth meeting the parties discussed the Union Shop Clause, Article V and the Good Samaritan Clause, Article XV (Safety). At the tenth meeting held on August 10, 1993 the parties agreed on the Good Samaritan Clause and further discussed the Probationary and Temporary Employees Clause, Article X. The eleventh meeting was canceled.

8. The translation on the record is in error. The submitted translation by the NLRB in its Memorandum is correct. J.E. # 85, p. 5.

petitiveness and the need to reach a level of $10 per hour in labor costs. He requested the Union for suggestions on how to reach such a figure. The Union reiterated there was no possibility of reaching a level of $10 or $11 an hour in labor costs. Espinosa stated that the Union's proposal would add costs rather than decrease them, increasing the labor costs from the present $17.84 hourly rate to $20. He added that the Union's proposals would only be considered if they helped reach Respondents' goal of decreasing costs and becoming more competitive. The Union then requested Respondent Molinos' financial statements for the past five years. Espinosa stated that Respondents' demands were based on competitiveness and not on a financial situation. He requested to the Union to make its financial disclosure demand in writing including the reasons for the petition. The Union stated it wanted the audited financial statements and a list of Respondent Molinos' clients. Figueroa asked three times whether Respondents were not alleging inability to pay. Espinosa evaded the question by not providing a straight yes or a no, but responded that "the issue" was not inability to pay but rather competitiveness in the market. The Union confirmed the financial statement request on a letter dated September 20, 1993.

At the sixteenth meeting, on September 21, Respondents distributed a document entitled "Company's Last Position With Respect to Non-economic Issues as of September 21, 1993". Espinosa stated the document included some changes from its previous position such as leaving the grievance and arbitration procedure as it was in the previous contract (not accepting the Union's proposed modification), changing the duration of the contract from 5 to 4 years, and a modification of a Union proposal for Article X Section 5 (Temporary Employees). Espinosa claimed that Respondents could not accept the Union's economic proposals because of their increased costs. Respondents then submitted a new economic proposal. The only modification from its original proposal was in Exhibit A to Article VIII, Section 1, where wages were established. In its original pro-

posal, Respondents had proposed only three classifications—skilled, semiskilled and unskilled—while in this new proposal it proposed five by adding "specialized" and "semi-specialized".[9] (Under the "CBA" there were 55 classifications). Additionally, the Respondents offered to pay a lump sum of $1,000 per month for six months to all the employees. The Union stated it disagreed with Respondents' proposal and that it would make a counterdemand to Respondents' economic and non-economic proposals at the next meeting.

Respondents answered the Union's written request on financial data through a letter dated September 20, 1993. Respondents refused to provide the requested data advising that the Union should first indicate specific reasons for requiring the information and its relevancy to the negotiations. Respondents further stated that while the Union was depicting Respondents posture as inability to pay, Respondent was claiming competitiveness and need to reduce labor costs.

At the seventeenth meeting, on September 28, the parties discussed an issue regarding subcontracting of work to aliens. The Union then complained that Respondents were posting armed personnel at the plant. Figueroa complained that Respondents had offered a final proposal on September 21, very early in the negotiations. He stated that the Union could have done the same, yet it did not. He said the Company was getting ready for a strike. However, he stated, the Union would be prepared for a strike and should Respondents forced them to, they would have to act and everyone would lose—the employees and the Company. Espinosa responded that Respondents did not want a strike. He stated that they only wanted to "close the agreement on October 28", and that even though their intention was not to provoke a strike, they had to be prepared for any eventuality. The Union then handed its counteroffer. Espinosa requested more time to analyze the Union's proposal.

At the eighteenth meeting, on October 5, Espinosa stated that the Union's proposal had been considered, but the same did not take into account Respondents' competitive-

---

**9.** Only approximately 30% of the employees were affected by these two new classifications.

ness, thereby increasing rather than helping to lower costs. Respondents distributed their counterproposal to the Union representatives and maintained its previous position as to all issues except as to the medical plan.[10] The Union rejected Respondents' health proposal. Espinosa countered that Respondents would not move further from their proposal because the Union was not giving consideration to Respondent Molinos' competitiveness. Figueroa stated that the Union was not willing to accept a decrease in salaries and benefits and that it would do whatever it had to do. Espinosa stated that the parties were miles apart and proposed to get a mediator. Figueroa responded it was too soon to get a mediator because the parties were still too far apart. Respondents then restated that to be competitive they had to lower labor costs. The Union renewed its request for the audited financial statements for the past five years. Respondents replied that they were considering furnishing the information but were waiting for the Union's written position on the grounds for said request. Both parties requested counteroffers.

At the nineteenth meeting, October 12, 1993, Figueroa stated that the Union was waiting for a response to its last offer, Espinosa responded that Respondents had previously presented their last offer; Respondents thus sustained their previous position.

At the twentieth meeting, on October 19, the Union handed a new counteroffer. Respondents rejected the Union's demand, claiming that it still called for increased costs and ignored Respondents' competitive objective. Respondents reiterated that they maintained their position from their last offer, and made no new offer. The Union announced that it would make yet another counterdemand. Respondents stated that they would not make counteroffers to the Union's demands that did not reduce costs. The Union stated it would make further movements from its last offer, but asked Respondents to make counteroffers. The Union again re-

quested the Respondents to furnish the financial information it had petitioned and asked for sales information, contracts and for information regarding the salaries and benefits of supervisors, managers and salesmen. The Union explained that once Respondents furnished the requested financial information, the Union would be able to consider a reduction in salaries and benefits. Espinosa told the Union that they were not claiming inability to pay but were rather claiming competitive disadvantages. Espinosa stated that notwithstanding they were waiting for the Union's letter explaining why this information was necessary. The Union requested that Respondents reply to its last two offers.

On October 21, 1993 the Union once again requested financial information in a letter addressed to Mr. Fred Lange. Respondents answered by letter dated October 25, 1993. In the letter the Company formally refused to provide the data because the Union had failed to provide reasons for requesting the information, and because Respondents were not claiming inability to pay.

At the twenty-first meeting, on October 26, Godbout spoke for Respondents. He stated that Molinos had prospered and done very well, and that Respondents had not realized that its labor costs were so far above the competition. He stated that Respondent Molinos was losing money in the business of foods, but "as a company"/, including flour and foods, it was still making money. He went on to say that Respondent Molinos' future was at risk because it had the highest production costs in Puerto Rico, and that Respondents had to reduce the number of employees in order to remain competitive. Godbout stated that the issue was not the amount of profits made, but the concern that Respondent Molinos remain competitive. He stated that a reduction in volume of business had been noticed and that it was attributed to an aggressive competition. He further stated that sales had decreased. The Union then requested all sales information for the

---

10. Under the previous CBA, Article XVIII, the Company paid for the totality of the individual and family coverage cost of the medical plan. Respondents' original proposal of June 17 stated that Respondents would pay only for individual coverage for the employee and any family cover- age would have to be paid by the employee. On October 5 Respondents proposed to modify its previous proposal by offering to cover 80% of the total cost of the medical plan—whether it be an individual or family plan. No additional coverage could be selected for optional dependents.

past three years. The Union asked Godbout whether it had studied the present and projected contracts of its competitors. Godbout admitted he had not studied them but had only looked at the differences in labor costs. The Union stated it believed Respondents could continue being competitive and that it would like to continue negotiating. Godbout stated he would speak to those at the corporate level [11], including General Manager Lange, and see if Respondents could reevaluate their position and see how far they could go. The Union informed Respondents that if the parties did not reach an agreement the following day at their scheduled meeting, the Union would go to the Conciliation and Arbitration Bureau or to a federal mediator to intervene in the negotiations.[12]

On October 27, the Union's committee arrived at Respondent Molinos' offices at 6:00 p.m. While they waited for Respondents' committee, a maintenance employee announced there was a bomb threat. The Union's committee left the building and waited outside. Upon seeing that Respondents' committee did not abandon the building, they returned. They met with Espinosa, Godbout, and Elba Delgado. Espinosa handed the Union committee a document and stated that it was Respondents' final offer and that there was nothing else to negotiate. This proposal was identical to what Respondents had offered on October 5. He also delivered to the Union Committee a letter stating that he believed the parties had reached an impasse and negotiations were not progressing because the Union continued to insist on wage and benefit increases. The letter also gave notice to the Union that Respondents would close down operations that evening, October 27, but employees would be paid as if they worked their regular schedules. The letter stated that Respondents would contin-ue operating under the previous CBA until the first shift on the following Monday, November 1, at which time it would implement its final offer. Finally, the letter stated that employees should show up to work for their regular schedules on November 1. Espinosa stated there was nothing else to discuss and Respondents committee left.

On October 28, Figueroa wrote to Espinosa requesting further bargaining negotiations, pleading to Respondents not to implement unilateral changes, and suggesting that they meet on November 1. Espinosa responded by letter dated October 28 stating "The time for negotiating is over", and declined the Union's invitation to meet. On October 29, the Union submitted a new proposal by letter making a substantial cut back from its previous demands and further stating that they "had even more flexibility in their proposals". Respondents did not reply to it until November 23, at a bargaining meeting between the parties, where it once again stated that Respondents were only willing to bargain down from the terms of the "CBA".

On October 29, Espinosa wrote to Figueroa stating that Respondents would reduce their labor force and that it would do so on November 1 by laying-off forty (40) employees. At a subsequent meeting, on November 23 [13], Godbout informed the Union that regardless when the CBA would be signed Respondent had already decided to reduce the work force to 85 employees.

On November 1, when the morning shift employees showed up to work, Elba Delgado, as Director of Human Resources, delivered to them a memorandum signed by Espinosa stating that Respondents had determined not to authorize employees to work until an agreement was signed by the parties.

During the week of October 27, Respondents called their corporate offices in Nebraska and asked that employees from other ConAgra facilities in the States be sent to work to Puerto Rico. The mainland employees started to arrive in Puerto Rico in Octo-

---

11. Referring to persons in the United States, clarified subsequently in the minutes of the day taken of Mr. Godbout's appearance.

12. Afterwards, the Union sought mediation. By letter dated October 29, the Union received notification from the Conciliation and Arbitration Bureau that Respondents did not accept its intervention.

13. In the interim Respondents executed unilateral changes to terms and conditions of employment and implemented a lock-out of employees. (Infra)

ber 30 and 31. After November 1, Respondent Molinos continued its operations with the replacements sent from the States. Respondents paid replacement employees' wages and benefits above those offered in the negotiations as of October 27 and over and above the wage scales under the CBA. Immediately after November 1, Respondents started to hire local replacements, offering them wages and benefits lower than what it had offered the Union as of October 27. The record reflects that Respondents have continued their operation in Puerto Rico with these replacements.

After November 1, mediator Elizabeth Guzmán called the parties to coordinate a joint meeting. On November 12 Respondents agreed to meet with the mediator and the Union on November 23.

The meeting on November 23 was held separately. The mediator met with the Union and subsequently with Respondents. At said meeting Godbout, the spokesperson for Respondents, informed the mediator that Respondents had locked out the employees because of alleged security reasons and in order to apply pressure on the Union to accept Respondents' final proposal. Respondent did not come up with new offers, and reiterated that they maintained their last offer. The minutes further reflect that when the mediator returned from meeting with the Union, she informed Respondents that the Union was still requesting the financial and sales information that was requested before the lock out. Godbout replied that all the information that the Respondents' were going to provide the Union had been orally given by Lange at the first meeting.

By letter dated November 24, Respondents announced to all Unit employees that they would no longer be covered by the medical plan.

In a letter dated November 30, 1993 the Union requested company's studies, financial statements, contracts with competitors, wage surveys at competitors, sales to competitors for the last five years, projected sales, margin of profits of other ConAgra Group, operational costs and comparison with competitors, information on the pension plan, all CBA's of ConAgra as a party and copies of payrolls for employees working at Molinos.

Respondents replied by letter dated December 29, 1993. It provided information regarding Respondents' comparative studies of wages and benefits paid by its competitors; it once again refused to provide the requested financial information, asserting they had never alleged inability to pay; that the Union had no right to that information; that it had no contracts with its competitors to supply to its clients. Respondents, however, provided the wage surveys it had for its competitors; that it had provided sales information for the past 3 years [14] and requested the Union to explain the relevancy for two more years (the Union had by now requested sales information for the past 5 years) and of projected sales. Respondents refused to provide information of other companies related to ConAgra outside of Respondent Molinos; but provided copy of the pension plan; and a list of temporary employees, with their respective wages and job classification presently working at Respondent Molinos. However, Respondent refused to provide the names of the temporary employees.

On December 16, the Union reiterated its request that the parties continue negotiations. Respondents responded by letter to the mediator that the parties continued to be at an impasse, and that it should be informed if there was a "significant change" by the Union. The Union in turn responded by letter dated December 29, that there had never been an impasse, that Respondents had created a fictitious impasse, in order to refuse to bargain. The Union continued to request the information previously sought.

### III. Respondent's Proposals of Wage & Benefit Reductions

The Regional Director urges us to conclude that the Respondent, because of its

---

14. The only sales information provided were four graphs prepared by Respondents and shown to the Union on the first meeting of June 17. This information was first provided to the Union with the December 29 letter. Two of these graphs show the annual volume of sales since 1990 for the feed department and for the flour department. The other two show the volume of sales to two of the Respondents' clients. All four graphs reflected a substantial drop in volume of sales from 1992 to 1993. No underlying documents to support the graphs were provided to the Union.

"rigid adherence" to wage and benefit reductions, made proposals that were "predictably unacceptable". Although we agree that respondents have incurred in an 8(a)(1) and (5) violation, we are not persuaded that Respondents bargaining proposals were per se a violation of law or that they were "predictably unacceptable".

■ The duty to negotiate in good faith mandated by Section 8(a)(5); 8(b)(3) and 8(d) of the Act requires both parties to bargain with a "serious intent to adjust differences and to reach an acceptable common ground". *NLRB v. Truitt Mfg.*, 351 U.S. 149, 155, 76 S.Ct. 753, 757, 100 L.Ed. 1027 (1956). Section 8(d) of the Act requires the employer and the employees' representatives to "meet at reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment ... but such obligation does not compel either party to agree to a proposal or requires the making of a concession." *NLRB v. American Natl. Insurance Co.*, 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027 (1952); *H.K. Porter Co. v. NLRB*, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970).

■ The duty to bargain in good faith requires both parties "to participate actively in the deliberations so as to indicate a present intention to find a basis for an agreement". *NLRB v. Montgomery Ward & Co.*, 133 F.2d 676 (9th Cir.1943). Both parties are thus required to have "an open mind and a sincere desire to reach an agreement". *NLRB v. Truitt Mfg. Co.*, supra. Furthermore, the employer and the Union are required to make "a sincere effort ... to reach a common ground." *NLRB v. Montgomery Ward & Co.*, supra.

■ In determining whether an employer has engaged in good faith as opposed to surface bargaining, the Board and the courts must engage in the task of examining the total conduct of the employer.[15] *Atlanta Hilton & Tower*, 271 NLRB 1600 (1984); *NLRB v. Cable Vision*, 660 F.2d 1 (1st Cir. 1981); *NLRB v. Herman Sausage Co.*, 275

F.2d 229, 231 (5th Cir.1960). The examination includes a review of the following: (a) delaying tactics, (b) unreasonable bargaining demands, (c) unilateral changes in mandatory subjects for bargaining, (d) efforts to bypass the Union, (e) failure to designate an agent with sufficient bargaining authority, (e) withdrawal of provisions already agreed upon, (f) arbitrary schedule of meetings.

■ The record reflects that Respondent was seeking reduction in wages and/or benefits that would decrease its cost down to the average hourly rate of its competitors. The uncontradicted record shows that while Molinos paid salaries and benefits averaging 17.84 per hour/employee, its five competitors, two of which were organized by the charging union, were paying their employees wages with a range of 5.64 to 13.76 per hour/employee.

Respondents' proposals were not "predictably unacceptable" since the Union already had agreed to bargaining agreements with competitors within the range of benefits equivalent to Respondents' proposals to the Union. Respondents' proposals cannot be stereotyped as predictably unacceptable since they were well within the range of labor costs of Molinos competitors as well as within the range of what the Union accepted from Respondents' competitors. *AMF Bowling Company, Inc.*, 303 NLRB 167, 169 (1991) (employer's wage survey demonstrated another union had accepted similar wage cuts. The employer was "entirely justified" in seeking wage and benefit reductions in its negotiations.)

Finally, the record shows that Respondent did not "rigidly adhere" to its bargaining proposal. Molinos modified its non-economic proposals on several occasions prior to September 14, 1993, when the Union requested that negotiations shift to economic matters. Thereafter, Respondent modified its economic position on September 21 and again on October 5, 1993. These modifications included changes in the coverage of medical plan (broader coverage than in original Respon-

---

15. The "totality of conduct" doctrine generally stems from *NLRB v. Virginia Electric & Power Co.*, 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348 (1941). See Hardin, *The Developing Labor Law*, Volume I, p. 608–609, N. 161.

dent's proposal), increase in wage proposal, and an offer to pay unit employees a bonus of $1,000 per month for a six month period following the execution of a new agreement.

The Supreme Court has repeatedly advised the Board against siding with the substantive proposals of any of the parties. *NLRB v. American Natl. Insurance Co.*, supra; *Labor Board v. Insurance Agents International Union*, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960); *American Ship Building Co. v. NLRB*, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965); *H.K. Porter Co. v. NLRB*, supra.

Finally, the Board has developed a clear track of jurisprudence that eschews evaluation of the reasonableness of the employers' bargaining proposals unless they are unduly "harsh or vindictive". *Chevron Chemicals*, 261 NLRB 44, 110 LRRM 1005, 1008, 1982 WL 24389 (1982); *Plymouth Stamping Division, Eltec Corp.*, 286 NLRB No. 85 (1987) (wage reduction); *Logemann Brothers Company*, 298 NLRB No. 155 (1990) (elimination of Union shop and check-offs); *I. Bahcall Steel & Pipe*, 287 NLRB 1257 (1988) (reductions in wages, hours, holidays, vacations, health and welfare); *Concrete Pipe & Products Corp.*, 305 NLRB 152 (1991) (reduction of wages in ⅓ reduction in holidays, and vacations in 50%). Hence, there is no "reasonable cause" under Section 8(a)(5) of the Act to conclude that Respondents bargaining proposals were by themselves violative of the Act.

### IV. Duty to Furnish Information

 The law on the employer's duty to furnish information is well chartered in *NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956), *NLRB v. Acme Industrial*, 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967); and First Circuit Court cases: *Teleprompter Corp. v. NLRB*, 570 F.2d 4 (1st Cir.1977) and *Western Mass Elec. Co. v. NLRB*, 573 F.2d 101 (1st Cir. 1978). As part of the 8(a)(5) duty to bargain, an employer has a duty to furnish all information requested by a Union that is necessary to fulfill its bargaining obligation as representative of the unit employees. *NLRB v. Acme Industrial*, supra, 385 U.S. at

page 435–36, 87 S.Ct. at 567–68. Information relating to wages, hours, terms and conditions of employment, negotiation of an agreement, and execution of an agreement, is presumed relevant under Section 8(d) of the Act and necessary for the Union to properly perform its obligations. *Teleprompter Corp. v. NLRB* supra, at page 8. Refusal to provide such information in most instances constitutes a per se violation of the duty to bargain in good faith. *Teleprompter Corp. v. NLRB* ibid.

 The rule for disclosure of financial data of the employer is, however, different. Financial data need not be revealed unless the Union first makes a showing that it is specially relevant to the bargaining taking place. The Union does not pass muster merely by claiming that the data would be helpful in performing its tasks. *Teleprompter Corp. v. NLRB* ibid. When the employer itself makes profitability an issue in contention—as by asserting an inability to pay an increase in wages—such information must be substantiated by the employer. *Teleprompter Corp. v. NLRB* ibid.

In *NLRB v. Truitt*, supra, the Supreme Court decided that the Board could lawfully find a refusal to bargain violation when an employer refused to disclose financial data while at the same time asserting financial inability to meet a union wage demand. However, as pointed out by the First Circuit in *Teleprompter Corp. v. NLRB* supra, at page 9, n. 2, the disclosure is not automatic in all economic inability to pay cases.

The rule on disclosure of financial data when the employer pleads inability to pay was expanded by the NLRB in the case of *Cincinnati Cordage & Paper Co.*, 141 NLRB 72, 52 LRRM 1277 (1963). There, it was held that an employer's resistance to a union's wages demand on the ground that it could not remain competitive with comparable employers triggered an obligation to reveal financial data because it constituted a poverty plea. However, in *Nielsen Lithographers Co.*, 305 NLRB 697 (1991), the Board retracted from the rule that "competitive disadvantage" served as the functional equivalent to a claim of inability to pay. The

majority in *Nielsen* held that information disclosure will no longer be caused merely by an "employer's projection of its future inability to compete" rather the duty will arise only· "when the employer has signified that it is at present unable to pay proposed wages and benefits". *Nielsen, supra,* at page 701.

"The difference between the two types of claims is critical. The employer who claims a present inability to pay, or a prospective inability to pay during the life of a contract being negotiated, is claiming essentially that it cannot pay. By contrast, the employer who claims only economic difficulties or business losses or the prospect of lay-offs is simply saying that it does not want to pay." *Nielsen, supra,* p. 701.

The Regional Director urges us to conclude on the strength of *The Shell Company,* 313 NLRB No. 12 (1993), that there has been a failure to disclose pertinent financial data. Petitioner further claims that while Respondent has been claiming lack of competitiveness, the "essential core" of Respondents bargaining position is grounded on assertions of a present threat to the employers survival and on an inability to pay at the present time or during the terms of the successor agreement[16] sought by the Union.

In *Nielsen,* supra, the Board clearly stated that should the employer allege inability to pay in asserting economic problems that have lead or will lead during the life of the contract being negotiated, the duty to disclose information will be triggered:

"Depending on the facts and circumstances of a particular case, the evidence may establish that the employer is asserting that the economic problems have led to an inability to pay or will do so during the life of the contract being negotiated."

The Regional Director points to facts on the record which the Court must evaluate to determine "reasonable cause to believe" the existence of a violation. Our inquiry is limited to determining if the facts are "fairly supported by the evidence" *NLRB v. Sullivan Brothers Printers, Inc,* supra; *Asseo v. Centro Médico Del Turabo,* supra.

■ Respondents' various remarks compel disclosure under the mandate of *Nielsen,* supra, and/or under the *Shell Co.,* supra, or under *Teleprompter,* supra, because "the employer itself puts profitability in contention".

During the first bargaining session Respondents spoke of the difficult situation of the Company and stated "if we don't take immediate measures there is a probability that we won't be here in the future". Respondents, further, suggested that they were considering closing the mill in Puerto Rico and bringing in the flour directly from the United States. Respondents further informed that they were loosing market share and sales volume and had recently lost its major client.

On the June 22, 1993 bargaining meeting Respondents representative stated:

"The situation is a serious one and fragile. Because of that we wanted to emphasize more volume and sales losses. The company is affected in the measure of a loss in sales volume and increase our costs. If you do not fill expectations since you are a very, very small part of ConAgra's operations, why should ConAgra care about the operation. If it does not matter to the membership that a lock be placed on it, ... We are trying to make the organization competitive and that can survive with that competition that operates with a lot less employees and low operation costs."

On August 24, 1993, Respondents representative stated: "Things like this [the need to eliminate from the CBA, Article XV, Section 1, the granting of a soap bar to employees] are what make us not competitive vis a vis the others and could make us have to close shop because we cannot compete".

Respondents also gave the Union further indications of financial problems when on October 26 Respondents stated that Molinos was losing money in the feed operations (although was still making money overall, counting both the feed and the flour operations) and that sales had decreased. Respondents depicted the situation as follows "we

---

**16.** Molinos was transferred from the Caribbean Basic Foods Division of ConAgra to the Grain Processing Company of ConAgra on or around June, 1993.

see the future as quite risky because of our ability to be competitive". Respondent further suggested that it was more economical to import its product from other places. ' During the course of the labor negotiations Respondent stated the necessity to reduce the number of employees, and on October 29 stated in writing that they had decided to lay-off forty (40) employees.

Respondents claim of a decrease in sales and losses in the feed business triggered an obligation to disclose the sales information requested by the Union on October 26, 1993 as proof of the accuracy of Respondents' claims. The meager information provided on December 29, 1993, the four paragraphs unsupported by the documentary evidence informed by Respondents does not pass muster since the disclosed information fails to comply with the standard of sufficiency set forth in *Teleprompter Corp. v. NLRB* supra, p. 11, n. 3, which standard is "revealing such information as the bargaining representative reasonably requires in order to meaningfully evaluate the employers claim . . ."

As to the financial information, Respondents' statements of the "seriousness" of the situation, "risky future", "fragile", the "immediate" measures that had to be taken and the suggestion that a "lock" could be placed on the plant by Respondent ConAgra, as well as its admission that the feed operation was having losses and that it had to lay-off forty employees besides those laid off in March (1993) triggered an obligation to furnish relevant financial information. While Respondents continuously reiterated that they needed to remain competitive and denied claiming inability to pay, the "essential core" of its bargaining posture, was in effect that it could not afford the terms of the successor contract.

The Court finds the instant case similar to that of the *Shell Company*, supra, wherein the Board stated that:

"Although respondent referred to economic disadvantages it had in relation to other competitors . . . the essential case of respondents bargaining posture as whole . . .

was grounded in assertion amounting to a claim that it could not economically afford the most recent contract at its airport operation that it was faced with a present threat to that operations survival, and that therefore, it was at present unable to pay those terms of the successor contract".

There is also reasonable cause to conclude that the Board will find that Respondents were obligated, independent of a theory based on an asserted "inability to pay", to furnish both the financial statements and the requested sales information because it placed that information into issue by claiming that its feed business was losing money, that sales had decreased, and by the general assertions that it needed deep concessions in order to survive. *Teleprompter Corp. v. NLRB* supra, at page 9.[17]

Finally, by letter dated December 29, 1993, Respondents refused to furnish the Union with information regarding the salaries and benefits offered by other ConAgra companies and the CBA in which said companies were a party, as requested in the Union's November 30 letter. Respondents simply stated, in response, that the Union "does not have a right to this information." Since the first bargaining session, however, Respondent Molinos' General Manager Lange had stated that "Our company will now be measured different from what we were measured in the past. This is because the Grain Processing Company (ConAgra) has more than sixty companies and they will be comparing us to them, not with results of the other companies in the island". As explained by the Union in a letter to Respondents dated January 3, 1994, and at the February 23, 1994 meeting if Respondent Molinos will be compared to ConAgra's other companies, information on these companies is clearly relevant and must be disclosed. There is "reasonable cause to believe" that, assuming arguendo that the lockout was lawful in its inception, it was converted into an unlawful lockout at this point, when the Respondents refused outright to provide this information. *Teleprompter Corp. v. NLRB* supra, (Multiplan

---

**17.** That claim, although denied by Respondents, resulted in an obligation to furnish the Union the requested financial information. *Facet Enter-*

*prises, Inc. v. NLRB*, 907 F.2d 963, 980–81 (10th Cir.1990).

employer who deals with separate locals at each plant location and pleads inability to meet the union's wage demands must furnish specific information on profitability at each plant if requested by the union).

Respondents valid regressive bargain proposals become tainted when simultaneously Respondents refused to provide the Union the information necessary to realistically weigh and consider the asserted need for the concessions and therefore constituted an overall refusal to bargain in good faith. *NLRB v. Ramona's Mexican Food Products, Inc.*, 531 F.2d 390, 394 (9th Cir.1975); *NLRB v. General Electric Co.*, 418 F.2d 736, 756–67 (2nd Cir.1969) Cert. denied 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970).

We must, therefore, conclude that the evidence "fairly supports" that there is "reasonable cause to believe" that Respondent has incurred in a refusal to bargain by failing to disclose or timely furnish financial and sales information requested by the Union.

### V. The Impasse

■ Respondent claims that there was a valid impasse reached by the parties. However, bad faith bargaining impedes the finding of a valid impasse.[18] *Bolton–Emerson, Inc. v. NLRB*, 899 F.2d 104 (1st Cir.1990); *NLRB v. Herman Sausage Co.*, supra, (employer refusal to bargain); *United Contractors*, 244 NLRB 72, enforced 713 F.2d 1322 (7th Cir.1983) (no impasse in face of bad faith bargaining); *Palomar Corp. & Gateway Sev. Co.*, 192 NLRB 592 (1971) (employer refusal to provide necessary bargaining information to union).

■ The Board also has reasonable cause to believe that there was no impasse in the alternative that Respondents fulfilled their obligation to furnish relevant and necessary information to the Union or were not required to do so based on the theory that

there was de facto no impasse reached at the negotiations.

On October 27, 1993 Respondents presented their "final and firm" offer to the Union stating that "we are at an impasse" and that it would abide with the terms of the "expired" CBA until the beginning of the first shift on November 1, when it would implement its "final and firm" offer. On October 28, 1993, however, the Union wrote to Espinosa inviting Respondents to continue the negotiations, stating that it was willing to negotiate further and that it had new offers to make. Respondents responded to this letter in writing, stating, "The time to bargain is over", and declined the Union's invitation to negotiate further. On October 29, 1993 the Union submitted a new proposal to Respondents decreasing the demands from its previous proposal and stating that "we have even more flexibility". With this new proposal the Union broke any impasse which in Respondents' view might have been reached on October 27, 1993. Hence there was no de facto impasse. *Teamsters Local Union No. 639 v. NLRB*, 924 F.2d 1078, 1084 (D.C.Cir.1991).[19]

> "If either negotiating party remains willing to move further toward an agreement, an impasse cannot exist: the parties perception regarding the progress of the negotiations is of central importance to the Board's impasse inquiry."

■ The net effect of an invalid impasse is that all subsequent unilateral changes made by the employer are illegal. *Litton Financial Printing v. NLRB*, 501 U.S. 190, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991); *NLRB v. Katz*, 369 U.S. 736, 741–748, 82 S.Ct. 1107, 1111–1114, 8 L.Ed.2d 230 (1962).

### VI. Unilateral Actions

As stated above Respondents did not reach an impasse with the Union either because it

**18.** Hardin, *The Developing Labor Law*, Third Edition VI, p. 697 (1992).

**19.** One of the criteria in determining if there is an impasse as expressed in *Taft Broadcasting Co.*, 163 NLRB 475, 478 (1967) petition for review denied sub nom. *AFTR v. NLRB*, 395 F.2d 622 (DCCir1968) is the "contemporaneous understanding of the parties as to the state of the negotiations". This criteria clearly is not met when one party remains willing to move further toward agreement. Other criteria are: bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement.

engaged in a refusal to bargain by failure to disclose information to the Union or because de facto there was no impasse. *Harriston Mfg. Corp.*, 272 NLRB 939 no. 1 (1984).

■■■ The Company effectuated unilateral changes to the contract and altered terms and conditions of employment without negotiating said modifications with the Union. Unilateral changes in benefits, even after a contract has expired, assuming the contract validly expired on October 28, 1993, but before impasse has been reached, are violative of the Act. *NLRB v. Katz*, supra; *Harold N. Hinson d/b/a Hen House Market No. 3 v. NLRB*, 428 F.2d 133 (8th Cir.1970). There is "reasonable cause to believe" that the unilateral actions taken by the Company of altering the form of payment of the employees from cash to check, the Company's refusal to provide the employees the contractual Thanksgiving turkey and the payment of accrued vacations, shall constitute a refusal to bargain in violation of Section 8(a)(5) of the Act. Respondents also unilaterally terminated the employees medical plan in violation of the Act.[20]

■■■ Respondents further announced a forty man lay-off without providing the Union proper opportunity to bargain relating to the magnitude of the lay-off and to its potential effects. Although the Employer did notify its economic situation and potential lay-off to the Union throughout the negotiation no opportunity to negotiate specifically a forty man lay-off was provided since the Company notified said forty man lay-off on October 25, 1993 to be effective on November 1, 1993. Even assuming that the lay-off itself was negotiated, no lay-off effects were negotiated. It is settled law that lay-offs and their effects are mandatory subjects of bargaining, *NLRB v. Advertisers Manufacturing Co.*, 823 F.2d 1086 (7th Cir.1987) (refusal to bargain a lay-off "sends a dramatic signal of the Union's impotence"); *Lapeer Foundry and Machine, Inc.*, 289 NLRB 952 (1988); *Tylertown Wood Products*, 251 NLRB 515 (1980) (lay-offs and

their effects are mandatory subjects of bargaining).

Respondents' claims that the lay-off was never implemented on November 1, 1993 as anticipated in writing because the employees were locked-out prior thereto. The problem with this theory is that at no time have Respondents stated to the Union that the lay-off contemplated in the implementation of their final offer has been set aside. Thus, the number of employees in the unit remains currently at a minus forty employees.

Hence, there is "reason to believe" that the employer has effectuated unilateral changes to existing terms and conditions of employment without bargaining to an impasse in violation of Section 8(a)(5); *Katz v. NLRB*, supra; *Litton Financial Printing v. NLRB*, supra.

### VII. The Lockout

■■ Respondents locked-out their employees on November 1, 1993. There is no doubt that a lockout is a lawful form of economic pressure. *American Ship Building, Co. v. NLRB*, supra. Pre-impasse lockouts are also lawful. *Darling & Co.*, 171 NLRB No. 95 (1968), enforced sub nom. *Lane v. NLRB*, 418 F.2d 1208 (D.C.Cir.1969).

■■ However, a lockout with a proscribed purpose is illegal and constitutes a violation of Section 8(a)(3). *American Ship Building Co. v. NLRB*, supra, 380 U.S. at page 313, 85 S.Ct. at pages 964–65. Hence, the purpose or motive behind a lockout is the critical factor in determining whether the lockout violates the Act.

■■ In the present case Respondents' position is that the lockout was in furtherance of their bargaining position. The Court concludes otherwise. Lockouts to compel acceptance of employer's conduct constituting unfair labor practices are illegal. *American Cyanamid Co. v. NLRB*, 592 F.2d 356, 364 (7th Cir.1979); *NLRB v. Bagel Bakers Council of Greater New York*, 434 F.2d 884, 888–90 (2nd Cir.1970) cert. denied 402 U.S. 908,

---

**20.** The terms and conditions of an expired contract subsist until a good faith bargaining impasse is reached. *Laborers Health & Welfare Trust Fund for N. California v. Advanced Light-* *weight Concrete Co.*, 484 U.S. 539, 108 S.Ct. 830, 98 L.Ed.2d 936 (1988); *Schmidt–Tiago Construction Co.*, 286 NLRB No. 31 (1987); *White Oak Coal Co.*, 295 NLRB No. 64 (1989).

91 S.Ct. 1380, 28 L.Ed.2d 648 (unlawful lockout in support of refusal to bargain; employer's refusal to disclose financial data); *Movers & Warehousemen's Association of Metropolitan–Washington v. NLRB,* 550 F.2d 962 (4th Cir.1977) cert. denied 434 U.S. 826, 98 S.Ct. 75, 54 L.Ed.2d 84. Respondents' hiring of temporary employees following a proscribed lockout violates Section 8(a)(3) of the Act. *Teamsters Local 639 v. NLRB,* supra. Hence, there is "reasonable cause to believe" that Respondents' lockout is in violation of Section 8(a)(3) of the Act because of its proscribed purpose. *American Shipbuilding Co. v. NLRB,* supra, 380 U.S. at page 313, 85 S.Ct. at pages 964–65.

### VIII. Joint Employers

■ The Regional Director urges that there is probable cause to determine that Respondents Molinos de Puerto Rico, ConAgra, Inc. and ConAgra Grain Processing Companies, Inc. are joint employers. The Court agrees.

■ A finding that companies are joint employers assumes in the first instance that companies which are independent legal entities have chosen to handle important aspects of their employer-employee relationship jointly. *NLRB v. Browning–Ferris Industries,* 691 F.2d 1117, 1122 (3rd Cir.1982). In joint employer situations, it is a matter of determination which of two, or whether both Respondents control, in the capacity of employer, the labor relations of a given group of workers. *NLRB v. Browning–Ferris,* supra, page 1122–1123. Joint employer status requires a showing that the alleged joint employer meaningfully affects matters relating to the employment relationship such as hiring, firing, discipline, supervision and direction. *Chesapeake Foods,* 287 NLRB No. 43 (1987). But the right of sufficient control over the labor relations is a determining factor by itself in concluding a joint employer status. *Cabot Corp.,* 223 NLRB 1388 (1978), aff'd. sub nom. *International Chemical Workers Local 483 v. NLRB,* 561 F.2d 253 (D.C.Cir.1977). Respondent Molinos is a wholly owned subsidiary of Respondent Con-

Agra. As such, Respondent Molinos uses as its logo and holds out itself to the public as a ConAgra enterprise. Some of the members of the Board of Directors of Respondent Molinos also hold positions at Respondent ConAgra.

At the first meeting on June 17, 1983, Respondent Molinos' General Manager Lange informed the Union of the recent change in the organizational structure of ConAgra, hence from then on Respondent Molinos would be part of more than sixty companies known as ConAgra Grain Processing Company and subsequently to be compared with them. At said meeting, Respondent ConAgra's Human Resources Vice-President, Raymond Godbout, was present.[21]

Godbout was responsible for the negotiation strategy and advised Respondent Molinos what had to be done in preparation for the negotiations. Godbout actively participated in various bargaining meetings. At the meeting of October 26, it was Godbout who stated to the Union representative: "what I would like to do is go back to my people and talk with the persons at the corporate level, [ConAgra], with Mr. Lange, and see what we can do. See if we can sharpen the pencil and present to you what our position is". On the following meetings after the lockout Godbout became the "de facto spokesperson" for the Respondents. It was therefore ConAgra who was determining the labor relations policies since Mr. Godbout is an employee of ConAgra and was consulting with ConAgra on the terms of the labor negotiation at hand. Further, when Respondent locked out its employees on October 29, they requested from corporate headquarters to provide temporary employees to continue operations. After November 1, Respondent Molinos continued operations with employees provided by Respondent ConAgra from several of its plants located in the United States. These employees were paid by other ConAgra companies for the work they performed at Molinos.

Finally, at the second meeting on June 22, 1993, Respondent Molinos made a proposal

---

**21.** Respondents admitted in their answer to the Petition for Injunctive Relief that Godbout is a supervisor. See paragraph 6(I) of the Petition and Respondents' answer to said paragraph.

on a drug policy. Said drug policy is that of ConAgra's at its continental plants in the U.S. Additionally, the pension plan that the employees have at Respondent Molinos is the same pension plan provided to other continental employees of ConAgra.

On this record, we must conclude that there is "reasonable cause to believe" that Respondent Molinos and Respondent ConAgra are joint employers and that their actions are to be attributed to each other in the negotiation matter. *NLRB v. Browning–Ferris*, supra

### IX. The Just and Proper Standard

■ Having concluded that there is reasonable cause to believe that Respondents violated the Act and that there is a strong likelihood that petitioner will prevail in the Board's proceeding, we examine the Regional Director's request under the "just and proper" standard. We examine the just and proper standard under the guidelines of *Planned Parenthood v. Bellotti*, supra; *Narragansett Indian Tribe v. Guilbert*, supra, and *NLRB v. Sullivan Brothers*, supra. We, therefore, must "examine the whole panoply of discretionary issues with respect to granting preliminary relief". *NLRB v. Sullivan*, supra, at page 63.

Respondent's unlawful bargaining conduct culminated with a large lockout burdening interstate commerce. The Respondents' unlawful refusal to bargain in good faith will inevitably exacerbate the dispute between the parties and prolong the industrial unrest, particularly when the locked-out employees lack the choice to work at Respondents premises.[22] An unlawful lockout irreparably harms the Union's support and its ability to bargain effectively on behalf of the unit employees.[23] In this regard, the evidence shows that while the Union enjoyed a large attendance of employees at the picket line immediately after the lock out there was a dwindling to only twelve to fifteen employees in attendance at the picket line. Union support is thus "eroding". *Asseo v. Centro Médico Del Turabo*, supra, at page 454.

Moreover, as in the case of *Maram v. Universidad Interamericana de P.R.*, supra, the action of the Employer in the instant case was directed against "the entire work force" thereby meriting the 10(j) injunctive relief issuance. An order requiring the Respondents to end the lockout and reinstate all unit employees locked out on November 1, 1993, with the terms and conditions of employment in existence prior to October 28, is therefore just and proper.[24] Absent such an

**22.** See generally *Lebus v. Manning, Maxwell & Moore, Inc.*, 218 F.Supp. 702, 705–06 (W.D.La. 1963); *DeProspero v. House of the Good Samaritan*, 474 F.Supp. 552, 559 (N.D.N.Y.1978); *Johnston v. Georgetown Steel Corp.*, 76 LRRM 2515, 2517 (D.S.C.1970).

**23.** See *Kaynard v. Bagel Bakers Council of Greater New York*, 57 Lab.Cas. (CCH) P. 12,499 Note 29 (interim reinstatement and bargaining order against unlawful lockout by 14–employer association after 8(a)(5) *Truitt*-information violation; "The effects (of the 11–month lockout) include the drifting away of union membership, the debilitation of the union's bargaining vigor, and the loss of revenue necessary to sustain its administration and the benefits it is committed to provide its member. The public at large, too, has suffered loss through the undermining, and rendering nugatory, of provisions of the Act...."). See also analogous cases granting interim reinstatement of unfair labor practice strikers, e.g. *Silverman v. Reinauer Transportation*, 130 LRRM 2505, 2508, 1988 WL 159172 (S.D.N.Y.1988), aff'd. unpub. order 880 F.2d 1319 (2nd Cir.1989) (unfair labor practice strike over employers' 8(a)(5) insistence on, and implementation of,

non-mandatory change in scope of the historic bargaining unit; "the fact that there are over 1000 Union members who have been on strike (for 9 months) and who may be forced to find new jobs and relocate themselves indicates that the Union members will suffer irreparable harm if they remain on strike until the NLRB makes its final decision and until that decision is enforced by an order from a Circuit Court of Appeals"); *Pascarell v. Orit Corp.*, 705 F.Supp. 200, 204–05 (D.N.J.1988), aff'd, unpub. order, 866 F.2d 1412 (3rd Cir.1988) (reinstate 45 ULP strikers); *D'Amico v. Cox Creek Refining Co.*, 719 F.Supp. 403 (D.Md.1989); *Leventhal v. Car-Riv Corp.*, 96 LRRM 2899, 2901–02, 1977 WL 1793 (E.D.Pa. 1977) (reinstate 115 ULP strikers); *Berkowitz v. Galvanizers*, 105 LRRM 3447, 3450, 1980 WL 18725 (N.D.Cal.1980); *Baldovin v. Ingram Mfg. Co.*, 90 LRRM 2644, 2651, 1975 WL 12058 (W.D.Texas 1975).

**24.** The reinstatement order may require the displacement or reassignment of the temporary replacements. This is appropriate interim relief, as the Section 7 rights of the discriminatees outweigh the job rights of the temporary replacements or reassigned workers. See *Maram v. Universidad Interamericana*, 722 F.2d at 959–60.

order, the employees will continue to be without work and its consequently lacking wages and benefits. Respondents' actions have caused many of the employees to be in arrears in their loans and are presently being threatened with legal collection. Thus, their credit has been irreparably damaged.

Unless Respondents are promptly ordered to bargain in good faith on an interim basis, the effectiveness of a Board order in due course will be greatly diminished. An employer's unlawful refusal to bargain in good faith with its employees' duly designated bargaining representative threatens the public interest [25] and can result in permanent injuries to the employees' loyalties to their incumbent union which the Board's administrative order in due course will be unable to adequately remedy.[26] Nor can the Board's ultimate order make the employees whole for the deprivation, *pendente lite*, of the possible benefits of good faith collective bargaining through the representative of their choice.[27]

The First Circuit has held that the "public interest" is served by the granting of interim 10(j) injunctive relief which strengthens the collective bargaining process. *Asseo v. Centro Médico Del Turabo, Inc., supra*, at p. 455, quoting *Asseo v. Pan American Grain*, 805 F.2d at 28.

Respondent has alleged that the preliminary injunction should be denied due to the Board's delay in seeking the 10(j) injunction. We disagree. In the instant case refusal to bargain charges were originally filed on December 2, 1993 and various amendments were made following bargaining current events as late as January and March of 1994. The complaint was issued by the Regional Director on March 25, 1994. The 10(j) complaint was filed in this Court on June 10, 1994. Refusal to bargain complaints require the thorough investigation of the Employer's "total conduct". In this respect a three month investigation of the charges and amendments is not unreasonable. A two and a half month period to file the 10(j) injunction is also not unreasonable. "A busy administrative agency cannot operate overnight. The very fact that it must exercise discretion, and that its decision is entitled to presumptive weight, ... indicate that it should have time to deliberate". *Maram v. Universidad Interamericana de P.R.* supra, at 960.

On the other hand, the effect on Respondent Molinos is minimal as the employees to be reinstated are familiar with Respondents' operations and while Respondents may suffer some losses by having to rescind the unilateral changes, the alternative (of not granting the injunction) involves the risk of the Union losing its very existence at Respondent Molinos and the employees suffering irreparable harm. While the reinstatement order may require the displacement or reassignment of the temporary replacements, this is appropriate interim relief, as the Section 7 rights of the discriminatees outweigh the job rights of the temporary replacements or reassigned workers. See *Maram v. Universidad Interamericana*, 722 F.2d at 959–60.

While Respondents have alleged that the relief sought is not proper because of Respondents' security concerns, there is "reasonable cause" to believe that the Board will find the evidence in the record insufficient to connect the Union or the employees with the alleged acts of violence. The Courts have recognized that injunctive relief is appropriate where an employer has refused to bargain even though there are allegations that

**25.** See *Hirsh v. Tube Methods, Inc.*, 125 LRRM 2198, 2207, 1986 WL 8951 (E.D.Pa.1986). Accord: *Little v. Portage Realty*, 73 LRRM 2971 (N.D.Ind.1970); *Humphrey v. Southside Electric Cooperative, Inc.*, 104 LRRM 2589 (E.D.Va.1979) (civil contempt); *Reynolds v. Curley Printing Co.*, 247 F.Supp. 317, 321 (M.D.Tenn.1965); *Madden v. Alberto–Culver Co.*, 49 LRRM 2516, 2517 (N.D.Ill.1961).

**26.** See, e.g. *Asseo v. Pan American Grain Co.*, 805 F.2d at 26–27; *Brown v. Pacific Telephone & Telegraph Co.*, 218 F.2d 542, 544 (9th Cir.1955) (as amended); *Squillacote v. U.S. Marine Corp.*, 116 LRRM 2663, 2665–66 (E.D.Wisc.1984).

**27.** *DeProspero v. House of the Good Samaritan*, 474 F.Supp. at 559; *Squillacote v. U.S. Marine*, 116 LRRM at 2665. Cf *Ex–Cell–O Corp.*, 185 NLRB 107, 110 (1970), mod. 449 F.2d 1046

the union is engaging in misconduct.[28] Notwithstanding, both the Board and the Courts have concluded that the "clean hands" doctrine is not applicable to Board proceedings. See, e.g., *N.L.R.B. v. Plumbers Union of Nassau County*, 299 F.2d 497, 501, 49 LRRM 2609 (2d Cir.1962); *Clear Pine Mouldings*, 268 NLRB 1044, 1047 n. 25, 1984 WL 36067 (1984), enf'd. 765 F.2d 148 (9th Cir.1985); *Eichleay Corp. v. NLRB*, 206 F.2d 799, 806 (3d Cir.1953). In addition, courts have refused to deny interim injunctive relief on the basis of the "clean hands" doctrine, since the Board acts in vindication of public rather than private rights. See *Henderson v. IUOE Local 701*, 420 F.2d 802, 808 (9th Cir.1969); *Schauffler v. Brewery and Beer Distributor Drivers Local 830*, 162 F.Supp. 1, 9–10 (E.D.Pa.1958).

### CONCLUSION

For the above stated reasons, there is reasonable cause to believe that Respondents have violated Section 8(a)(1), (3) and (5) of the Act; noting the strong likelihood of success of the complaint against Respondents, the relief sought herein, as alleged in the Petition, is just and proper. Thus, the request for preliminary injunction is *Granted.*

Now therefore it is hereby ordered that, pending the Board's final disposition of the matters herein, Respondents ConAgra, Inc. and/or ConAgra Processing Companies and Molinos de Puerto Rico, Inc., their successors and assigns, officers, representatives, agents, servants, employees, attorneys and all persons acting in concert or participation with it or them, be and they are hereby enjoined and restrained from:

(a) refusing to meet and bargain in good faith with the Union as the exclusive collective-bargaining representative of the unit employees;

(b) failing or refusing to promptly provide the Union with all requested information necessary and relevant for collective bargaining, including, but not limited to, financial statements for the last five years, information relating to the Employer's sales in the past three years, and information relating to salaries and benefits offered by other companies which are part of ConAgra Grain Processing Companies and any collective bargaining agreements to which any of those companies are parties;[29]

(c) unilaterally changing any term or condition of employment of unit employees, including, but not limited to, the layoff of unit employees and changes in employee health insurance, without first giving the Union prior notice of the proposed change and an adequate opportunity to bargain to agreement of good faith impasse concerning such proposed change;

(d) locking out or otherwise discriminating against employees because of the bargaining position of the employees' designated bargaining representative and in furtherance of the Employer's own unlawful bargaining conduct calculated to frustrate the bargaining rights of employees; and

(e) in any other manner interfering with, restraining or coercing its employees in the exercise of their Section 7 rights.

2. It is further ordered that, pending the Board's final disposition of the matters herein Respondents, its successors and assigns, officers and representatives, agents, servants, employees, attorneys, and all other persons acting in concert of participation with it, shall:

(a) upon request, meet and bargain in good faith with the Union as the designated exclusive collective-bargaining representative of the Employer's unit employees concerning

(D.C.Cir.1971), enf'd. 449 F.2d 1058 (D.C.Cir. 1971).

**28.** See *Johnston v. Georgetown Steel Corp.*, 76 LRRM at 2517.

**29.** Since the Union also represents Respondents' competitors and since the information requested is not otherwise public information and because Respondents claim a proprietary interest, the Union shall not be authorized to divulge the information disclosed to third parties (except financial experts) and shall take all steps necessary to avoid the leakage of said information to competitors. The Union shall agree to a reasonable confidentiality agreement supervised by the NLRB. We shall retain jurisdiction over said subject matter. *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 318–320, 99 S.Ct. 1123, 1132–1134, 59 L.Ed.2d 333 (1979).

their wages, hours and other terms or conditions of employment;

(b) restore all changed working conditions to those which existed prior to October 28, 1993, and maintain them until the parties bargain in good faith to an agreement or impasse concerning any proposed changes;

(c) upon request, promptly provide the Union with all requested information necessary and relevant for collective bargaining, including, but not limited to, financial statements for the last five years, information relating to the Employer's sales in the past three years, and information relating to salaries and benefits offered by other companies which are part of ConAgra Grain Processing Companies and any collective bargaining agreements to which any of those companies are parties;

(d) offer each and every employee of the Employer's payroll as of October 27; 1993, full and immediate reinstatement without back pay [30] to his or her former position at the terms and conditions of employment in effect on October 27, 1993, or, if those positions no longer exist, to substantially equivalent positions, without prejudice to their seniority or their rights and privileges, displacing, if necessary, any newly hired or reassigned workers;

(e) post copies of the District Court's opinion and order, in Spanish and English, at the Employer's Guaynabo, Puerto Rico, facility in all locations where employer notices to employees are customarily posted; said postings shall be maintained during the pendency of the Board proceeding free from all obstructions and defacement; and agents of the Regional Director of Region 24 of the Board shall be granted reasonable access to the Employer's facility to monitor compliance with this posting requirements; and

(f) within twenty (20) days of the issuance of this Order, serve upon the District Court and submit a copy to the Regional Director of Region 24 of the Board, a sworn affidavit from a responsible Employer official describing with specificity the manner in which the Employer has complied with the terms of the decree.

**SO ORDERED.**

---

30. The potential back pay remedy is to be obtained from the Board's final decision.