CONAGRA, INC., et al., Petitioners,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 96–1367.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 9, 1997.

Decided July 8, 1997.

**1436**

Roger J. Miller, Omaha, NE, argued the cause and filed the brief for petitioner.

Robert J. Englehart, Attorney, National Labor Relations Board, Washington, DC, argued the cause for respondent, with whom Linda R. Sher, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel, were on the brief.

Marsha S. Berzon, San Francisco, CA, argued the cause for amicus curiae American Federation of Labor and Congress of Industrial Organizations, with whom Jonathan Hiatt, Boston, MA, and James B. Coppess, Washington, DC, were on the brief.

Before WALD, WILLIAMS and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Separate concurring statement filed by Circuit Judge WALD.

WALD, Circuit Judge:

In June of 1993, Molinos de Puerto Rico, Inc. ("Molinos"), a wholly-owned subsidiary of ConAgra, Inc. ("ConAgra"), began negotiating with the Congreso de Uniones Industriales de Puerto Rico ("the Union") concerning the establishment of a new collective bargaining agreement ("CBA"). The parties quickly found that their respective proposals were radically different: The Union wanted to raise wages and benefits above existing levels, while Molinos desired to lower them substantially. The parties failed to reach an agreement by October 28, the existing agreement's expiration date, and on November 1 Molinos locked out the employees. Between December, 1993, and March, 1994, the Union filed a series of charges with the National Labor Relations Board ("the Board"), alleging that Molinos' conduct surrounding the failed negotiations and lockout violated the National Labor Relations Act, 29 U.S.C. § 151 et seq. ("the Act"). The Board found that Molinos and ConAgra violated the Act by refusing to provide financial information requested by the Union, intentionally creating a negotiating impasse, and unilaterally altering the terms and conditions of employment in the absence of a genuine impasse. The Board now asks this court to enforce in full its order requiring Molinos and ConAgra to cease committing these violations, and ConAgra requests that we decline to enforce any portion of the order.

We reject the Board's finding that Molinos and ConAgra violated the Act by failing to provide all of the financial information requested by the Union. In our view, the Board's conclusion that Molinos effectively claimed an "inability to pay" the wages proposed by the Union, thereby triggering an obligation to provide supporting financial information upon request, represented an unacknowledged and unexplained departure from the Board's decision in The Nielsen Lithographing Company, 305 N.L.R.B. 697 (1991). We also reject the Board's conclusion that Molinos engaged in unlawful "surface bargaining," as unsupported by substantial evidence in the record considered as a whole. With regard to the Board's finding that a ConAgra executive violated the Act by seeking to condition the provision of financial information to the Union on the Union's withdrawal of an "unfair labor practice" charge, we remand the matter to the Board for its consideration of whether this finding may stand despite our rejection of the other findings.

## I. BACKGROUND

Molinos and the Union began negotiations for a new CBA on June 17, 1993. Molinos'

representatives initially made a presentation that focused on Molinos' position and importance within ConAgra, and on the gap between the wages paid by Molinos under the existing CBA and those paid by Molinos' competitors in Puerto Rico. The presentation included a chart showing that Molinos paid an average hourly wage of $17.84 while its competitors paid between $5.64 and $13.76, another showing that Molinos' profits represented 1.6% of ConAgra's profits in 1992, and another indicating that Molinos' sales volume in animal feed had declined sharply during the prior year. After the presentation, Molinos' chief negotiator presented the Union with Molinos' proposal to cut wages from $17.84 to $11.11. At the next session, the Union representative accused Molinos of negotiating in bad faith. Molinos' representative acknowledged that the proposal was "radical," adding that "we need to be competitive," and "[w]e want the company to continue." Deferred Appendix ("D.A.") at 959.[1] The Union and Molinos then devoted the next eight negotiating sessions to non-economic proposals.

The parties returned to the wage proposals at their eleventh bargaining session, held on September 14, 1993. Molinos' representative began by reintroducing the graphs that Molinos' General Manager had used in his presentation at the first session, and soliciting the Union's response to the individual components of Molinos' economic proposals, each of which the Union rejected. The Union representative then stated that the Union wanted to use its own proposal, which called for an increase in hourly wages from $17.84 to $20.00, as the basis for negotiation. Molinos' representative agreed to consider the Union's wage proposal, but reiterated that Molinos needed to reduce its overall labor costs in order to stay competitive. At this point, the Union requested that Molinos turn over its certified financial statements for the prior five years. Molinos' representative asked the Union to submit its information request

in writing and to explain its relevance to the negotiations, stating: "[O]ur petitions are not based on the financial statement, but more so on the competitiveness of our costs against a market that we have that which [sic] is much lower than ours," and: "The issue that we are bringing is not the Company's ability to pay, but more so the competitiveness in our market, specifically in our labor costs." *Id.* at 1003–04. The Union's representative acknowledged that he understood Molinos' assertion: "What you are saying is that the Company is not alleging that it does not have the ability to pay." *Id.* at 1004. Subsequently, on September 20, the Union sent Molinos a letter reiterating its information request, and adding a request for the names of all of Molinos' clients for the past three years; the letter included no explanation of the reasons for these requests or of their relevance to the bargaining process.

The parties continued to meet through the end of October, but made no substantial progress on the wage issue—the Union stood by its demand to increase wages above their existing levels, while Molinos continued to propose reducing wages below existing levels. The Union repeated its request for financial information (midway through one negotiating session, the Union's representative added requests for records of Molinos' "sales, the contracts," and "what each and every one of the supervisors, administrators, managers, salespersons and owner of the Company, earn," *id.* at 1034), while Molinos continued to assert that it had never claimed that it was in poor financial condition or was unable to pay the wages sought by the Union, and to ask that the Union explain the relevance of the requested information.

On October 27, Molinos' representative delivered the company's "last and final offer," along with a letter stating that the parties had reached an impasse and giving the Union notice of Molinos' intention to close its facilities that evening. Molinos locked out the employees on November 1, citing the failure

---

1. The passages presented here as direct quotations from the negotiations are taken directly from the record, but are not necessarily verbatim. In many cases the statements were recorded by a minute-taker, rather than by a stenographer or recording device, and many of the statements were made in Spanish. However, the parties began each negotiation session by ratifying the minutes from the previous session, and neither party has challenged the accuracy of the recorded statements in this appeal.

to reach agreement regarding a new CBA. On November 30, the Union demanded that Molinos disclose the "profit margin for the rest of the feed industries that belong to the ConAgra group, how much is the operational cost for each item and a comparison of it with the other competitors within its geographical state for within the state of the United States where it is located [*sic*], and analyze the competitiveness margin followed by the company in said feed industry compared with its analogue in the United States." *Id.* at 834. In a December 29 letter, Molinos provided the Union with information regarding Molinos' wages, its competitors' wages, its pension plan, and the number of temporary workers employed at Molinos mills, but asserted that the Union was "not entitled" to requested information regarding financial statements, an additional two years' worth of information on sales to competitors, or any information regarding ConAgra companies other than Molinos; Molinos also claimed that it had no contracts with its competitors and did not understand the Union's reference to the "ConAgra group." *Id.* at 839. The parties unsuccessfully met with a mediator several times between November, 1993 and February, 1994.

In 1995, the Board petitioned a federal district court for a temporary injunction prohibiting Molinos from refusing to bargain in good faith, refusing to supply relevant information requested by the Union, unilaterally changing the terms and conditions of employment, or locking out Union employees.[2] *See Rivera–Vega v. ConAgra, Inc.,* 876 F.Supp. 1350 (D.P.R.1995). Finding that there was "reasonable cause" to believe that Molinos had violated the Act, and that the Board's "unfair labor practice" charges were likely to succeed on the merits, the district court granted the requested preliminary injunction; the injunction was to expire automatically upon the Board's final disposition of the charges. *See id.* at 1372. The First Circuit affirmed the grant of the injunction later that year, holding that the district court's order constituted neither "clear error" nor an

abuse of discretion. *Rivera–Vega v. ConAgra, Inc.,* 70 F.3d 153, 156 (1st Cir.1995).

On June 13, 1995, one of the Board's Administrative Law Judges ("ALJs") issued a decision finding that Molinos had failed to bargain in good faith by withholding information it was obligated to provide, purposely creating a bargaining "impasse," and making unilateral changes in the terms and conditions of employment in the absence of a genuine impasse. *See ConAgra, Inc.,* 321 N.L.R.B. 944, 949–65 (1996). The Board affirmed the ALJ's findings on August 20, 1996, *id.* at 944–46, with one member dissenting. *Id.* at 946–47 (Member Cohen, dissenting in part). This appeal followed.

## II. Discussion

A reviewing court sets aside decisions of the Board only when the Board has acted arbitrarily or otherwise erred in applying established law to the facts, or when its findings of fact are not supported by "substantial evidence" in the record considered as a whole. *See Allegheny Ludlum Corp. v. NLRB,* 104 F.3d 1354, 1358 (D.C.Cir.1997); *see also* 29 U.S.C. § 160(e) (1994); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). With this standard of review in mind, we turn to the Board's findings underlying the challenged order.

### A. Molinos' Refusal to Provide All of the Financial Information Requested by the Union

An employer commits an "unfair labor practice" under §§ 8(a)(1) and 8(a)(5) of the Act by interfering with, restraining, or coercing its employees in the exercise of their right to form labor organizations and to bargain collectively, *see* 29 U.S.C. § 158(a)(1), or by refusing to bargain collectively with the legitimate representatives of its employees. *See id.* at § 158(a)(5). The duty to bargain collectively includes the duty to meet and confer "in good faith" with employee representatives with respect to wages, hours, and other terms and conditions of

---

**2.** Section 10(j) of the Act authorizes the Board to request, and federal courts to grant, "appropriate temporary relief or restraining order[s]" upon

the Board's issuance of complaints alleging violations of the Act. *See* 29 U.S.C. § 160(j) (1994).

employment. *Id.* at § 158(d). The duty to bargain in good faith also includes the obligation to provide the union with information relevant to the collective bargaining process in certain circumstances. *See Detroit Edison Co. v. NLRB,* 440 U.S. 301, 303, 99 S.Ct. 1123, 1125, 59 L.Ed.2d 333 (1979). Although the relevance of information concerning the terms and conditions of employment is presumed, *see Ohio Power Company,* 216 N.L.R.B. 987 (1975), no such presumption applies to an employer's information regarding its financial structure and condition, and a union must demonstrate that any requested financial information is relevant to the negotiations in order to require the employer to turn it over. *See International Woodworkers v. NLRB,* 263 F.2d 483, 485 (D.C.Cir. 1959).

In *NLRB v. Truitt Manufacturing Company,* 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956), the Supreme Court spoke to the question of whether and how an employer's statements and conduct during negotiations can cause the employer's financial information to become relevant to the negotiations. The Court held that, in the context of negotiations over a new CBA, an employer's "refusal to attempt to substantiate a claim of inability to pay increased wages may support a finding of a failure to bargain in good faith." *Id.* at 153, 76 S.Ct. at 756. The Court emphasized that it was not saying that the union is entitled to supporting information in *every* case in which economic inability is raised as an argument against increasing wages; rather, the Court noted that "[e]ach case must turn upon its particular facts. The inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met." *Id.* at 153–54, 76 S.Ct. at 756 (footnote omitted). Prior to 1991, the Board construed the *Truitt* decision to oblige employers to provide unions with supporting financial information even when the employer's only statements tending to put its financial condition in issue consisted of assertions that acceding to the union's wage demands would create or exacerbate a "competitive disadvantage." *United Steelworkers Local 14534 v. NLRB,* 983 F.2d 240, 244 (D.C.Cir. 1993). Subsequently, however, in response

to a trilogy of Seventh Circuit decisions, the Board underwent a "change of heart." *Id.*

First came *NLRB v. Harvstone Manufacturing Corporation,* 785 F.2d 570 (7th Cir. 1986), in which the Seventh Circuit rejected the Board's finding, *see Harvstone Manufacturing Corporation,* 272 N.L.R.B. 939 (1984), that the negotiating representative of several lighting fixture companies had effectively claimed an "inability to pay" by warning the negotiators for an electrical worker's union that if the companies "don't make a reasonable profit so they can be a viable competitive business, they won't stay in business, and no one will have jobs." *Harvstone,* 785 F.2d at 576. The court declared that such statements are "nothing more than truisms," because "if an employer operates at a competitive disadvantage for a long enough time, its profit margin, as a matter of pure economics, will decline eventually forcing it out of business." *Id.* at 577. The court reasoned that, if these statements suffice to require financial disclosures, then *any* assertion that acceding to the union's demands would create or perpetuate a competitive disadvantage could be characterized as a claim of "inability to pay" at some point in the future what the union is demanding at the present time. Therefore, the court declared that "the relevant time period" against which to assess such statements is not the "indefinite[ ]" future, but only the term of the CBA under negotiation, since it is generally "quite conceivable" that an employer could pay increased wages during the term of one CBA, even if paying these wages would put the employer at a competitive disadvantage. *Id.* Thus, the court held that when an employer asserts that the wages demanded by the union would put the employer at a competitive disadvantage, the employer does not thereby obligate itself to provide supporting financial information unless these statements also suggest that this competitive disadvantage would give rise to an inability to pay the wages demanded by the union during the term of the CBA under negotiation. *See id.* Because it concluded that the record did not include substantial evidence to support findings that some of the respondent employers had claimed such imminent financial hard-

ship, the court refused to enforce the Board's order with regard to those employers. *See id.* at 581.

Two months after the Seventh Circuit's *Harvstone* decision, the Board issued a decision in *The Nielsen Lithographing Company,* 279 N.L.R.B. 877 (1986), affirming an ALJ's finding that the negotiator for the Nielsen Lithographing Company ("Nielsen") had effectively claimed an "inability to pay" wages demanded by the union by stating that, despite the company's current profitability, the union's rejection of the company's proposed economic concessions would lead to a loss of jobs and possible failure of the business, with the result that the company "could not compete." *See id.* at 877 n. 3, 879. In support of this finding, the ALJ had referred to Nielsen's assertions that it had been losing business to competitors, and that it needed to bring its wages and fringe benefits more in line with those of its competitors in order to "compete," to "protect the jobs of [its] employees," and "[t]o survive." *Id.* at 879. The ALJ also had cited the Board's *Harvstone* decision, which the Seventh Circuit later criticized and refused to enforce in full. *See id.* at 879 n. 5. Although the Seventh Circuit rendered its *Harvstone* decision between the ALJ's decision and the Board's decision affirming the ALJ's findings, the Board made no reference to the Seventh Circuit's criticisms of the Board's "inability to pay" analysis. *See id.* at 877. Nielsen asked the Board to reconsider its decision in light of *Harvstone,* but the Board refused, claiming that Nielsen's petition for reconsideration failed to assert any matter that it had not already considered. *See Nielsen Lithographing Company v. N.L.R.B.,* 854 F.2d 1063, 1066 (7th Cir.1988) ("*Nielsen I*").

Nielsen then sought review of the Board's order in the Seventh Circuit, which predict- ably set aside the order, criticizing the Board for failing to respond to the criteria laid down in its *Harvstone* opinion.[3] *See id.* The court, with then-Judge (now Chief Judge) Posner writing, interpreted *Truitt* as an attempt to limit the amount of "bluff, guesswork, and sheer gambling" that unions must engage in during contract negotiations. Absent access to employer-held information necessary to evaluate the employer's claim of inability to pay, the court observed, the union faces the "Hobson's choice" of either holding fast to its wage demands in the hope that the employer is bluffing (the "Russian roulette" option), or abandoning wage demands that the employer might in fact have been able to afford easily. *Id.* at 1065. The court noted that the ALJ's application of *Truitt* to Nielsen's statements did not constitute "an irrational extension" of that decision, because an employer's prediction that the company's future will be bleak if wage concessions are not made is a "serious and factual claim," and one which the union arguably must, in order to engage in "[i]nformed bargaining," be permitted to evaluate using the employer's financial data. *Id.* It nevertheless concluded that the Board's total failure to address the Seventh Circuit's *Harvstone* decision constituted "disingenuous, evasive, and ... dishonest" disregard of relevant judicial precedent, and that the Board's order could not stand without some attempt by the Board to deal with *Harvstone. Id.* at 1067. The court reminded the Board that, on reconsideration of its *Nielsen* order, it could hew to its original position that it was an acceptable "extension" of *Truitt* and reject the court's proffered guidance in *Harvstone,* or it could accept *Harvstone* but conclude that the facts in *Nielsen* were distinguishable from those in *Harvstone* and "within the gravitational field of *Truitt*"; beneficently it declared that it

---

**3.** The Seventh Circuit apparently believed that it had not issued its *Harvstone* decision until *after* the Board rendered its first *Nielsen* decision. *See id.* at 1065–66 ("[R]ight after [the Board] ruled in favor of the union we decided [*Harvstone*].... [W]e did not think the Board gifted with prevision and therefore able to read and evaluate our decisions before they are rendered."). Actually, the court's *Harvstone* decision issued two months *before* the Board's first *Nielsen* decision. *See Harvstone,* 785 F.2d at 570

(decided March 6, 1986); *Nielsen,* 279 N.L.R.B. at 877 (decided May 8, 1986). At any rate, the court thought it inappropriate for the Board in *Nielsen* to offer no "reasoned discussion" of the court's *Harvstone* decision because the Board's analysis of "inability to pay" claims plainly conflicted with the analysis proffered in that decision, and this rationale for criticizing the Board's initial refusal to reconsider *Nielsen* remains appropriate. *Id.*

would "be happy to reexamine *Harvstone*" if the Board offered compelling criticisms of that decision. *Id.* But the bottom line was that *Nielsen* and *Harvstone* could not coexist without some further accommodation or explanation by the Board.

On remand of *Nielsen*, the Board abandoned its own *Harvstone* decision and submitted to the "guid[ance]" of the Seventh Circuit, releasing Nielsen from the obligation to provide the union with financial information. *See The Nielsen Lithographing Company*, 305 N.L.R.B. 697, 699 (1991). The Board said it agreed with the Seventh Circuit's temporal analysis in *Harvstone*, and announced that it would thenceforth deal with employer claims of "inability to pay" by distinguishing between employer statements and conduct asserting inability to pay union proposals at some point during the term of the CBA under negotiation, and employer statements and conduct suggesting, in a more general fashion, that accession to union demands would create "economic difficulties or business losses or the prospect of layoffs." *Id.* at 700. In Nielsen's case, the Board held that the company's negotiating statements and conduct clearly were not susceptible to the "can't pay [within the CBA term]" interpretation that would trigger an obligation to turn over financial data—Nielsen's representative had repeatedly stressed that it continued to turn a profit (although it claimed to be losing business to competitors), disavowed any claim of inability to pay, and said merely that it would face difficulty in meeting union-proposed labor costs "at an unspecified point 'in the future.'" *Id.* at 700–01. In so holding, the Board rejected the dissenting Chairman's argument that an employer should be obligated to supply the union with supporting information whenever it makes a claim that is objectively verifiable, and that Nielsen had obliged itself to turn over financial information by making objectively verifiable claims

regarding its current economic condition. *See id.* at 700; *cf. id.* at 706 (Chairman Stephens, dissenting).[4]

The union petitioned the Seventh Circuit to deny enforcement of the Board's *Nielsen* order, asking the court to overrule or distinguish its *Harvstone* decision. *See Graphic Communications Int'l Union v. NLRB*, 977 F.2d 1168, 1169 (7th Cir.1992) ("*Nielsen II*"). The court (with then-Judge Posner once again writing) declined, satisfied that the Board was within its discretion in refusing to "exten[d]" *Truitt* in the fashion that it had previously indicated would be permissible. *Nielsen I*, 854 F.2d at 1065. The *Truitt* decision, it noted, stood for the proposition that an "express or implied threat (of bankruptcy)" triggers an obligation to provide supporting financial information, and because no such threat was discernible in the comments made by the relevant companies in *Harvstone* or *Nielsen*, *Truitt* did not apply of its own force to either case. *Nielsen II*, 977 F.2d at 1170. At the same time, the court signaled its receptivity to the argument advanced by the dissenting Chairman in the Board's *Nielsen* decision by stating that "[i]f [an employer] makes claims of poverty, *or any other substantiatable factual claim*, it must substantiate the claims if the union so demands." *Id.* at 1171; *compare Nielsen*, 305 N.L.R.B. at 706 ("The classic *Truitt* dichotomy, as it has evolved, between 'inability to pay' and 'unwillingness to pay' is intended to distinguish between an objective factual claim (subject to verification) and a subjective claim (not subject to verification).") (Chairman Stephens, dissenting); *id.* at 706–07 (citing *Nielsen I*). Thus endeth the Board–Seventh Circuit colloquy.

Meanwhile, a union petitioned our own court for review of the Board's *Concrete Pipe and Products* decision, 305 N.L.R.B. 152 (1991), which was very similar to *Nielsen* but was decided two months earlier.[5] In *United*

---

4. One other Board member wrote a brief concurring opinion, agreeing with the majority's holding, but on the somewhat different ground that Nielsen's claims regarding the future effects of acceding to the union's demands were not·"sufficiently verifiable" to render the provision of the requested information helpful to the bargaining process, because projections of a business' future financial condition are unreliable and involve

numerous "subjective, judgmental, and theoretical factors." *Id.* at 702 (Member Oviatt, concurring); *cf. id.* at 707 (Chairman Stephens, dissenting).

5. The Board's *Concrete Pipe and Products* decision did not cite the Seventh Circuit's *Harvstone* decision, but the Board later confirmed that *Concrete Pipe and Products* followed the *Harvstone-*

*Steelworkers,* we reviewed the Board's finding that the representative of a concrete pipe manufacturing company had violated the Act by refusing to provide the union with requested financial information after the company's representative had warned the union negotiators that "[t]o survive in today's market we have got to be able to be competitive, and to be competitive wage rates and benefits must be lowered." *United Steelworkers,* 983 F.2d at 242. The employer had also countered the union's demand for a "large wage increase," *Concrete Pipe and Products,* 305 N.L.R.B. at 156, with a proposal to reduce wages to thirty percent below their current level, reduce vacations by fifty percent, reduce medical insurance premiums by fifty percent, and reduce holidays by fifty-five percent. *See United Steelworkers,* 983 F.2d at 242. Rejecting the ALJ's contrary finding, the Board had found that no obligation to disclose financial information arose on these facts, because the statements made by the employer's representative "pertain[ed] only to declining market conditions attributable to competition from other businesses," *Concrete Pipe and Products,* 305 N.L.R.B. at 152, and because the employer's representative "did not assert that [the employer] was losing money or that its business was at some imminent risk of closing down." *Id.* at 153. On review of the Board's decision, we noted that the Board's distinction between "inability to pay" claims and "competitive disadvantage" claims constituted a "more restrictive reading" of *Truitt* than the Board had previously applied to union requests for employer financial information, but we held that this shift was adequately explained in the Board's second *Nielsen* decision, and that the principle announced in the second *Nielsen* decision was a "permissible reading of the broad terms of [the Act]." *United Steelworkers,* 983 F.2d at 244–45.

■ The Board asks us to enforce its order requiring Molinos and ConAgra to turn

over all of the financial information requested by the Union, and avers that its findings underlying this order are not inconsistent with its second *Nielsen* decision or with *Concrete Pipe and Products.*[6] We disagree. In our view, the facts relied upon by the Board in this case clearly fall on the other side of the *Nielsen* dividing line and are basically akin to those in *Nielsen* and in *Concrete Pipe and Products.* As in *Nielsen* and *Concrete Pipe and Products,* the employer and the union had a longstanding relationship spanning several prior CBAs. *See Nielsen,* 279 N.L.R.B. at 877 (over thirty years); *United Steelworkers,* 983 F.2d at 242 (thirty years); *ConAgra,* 321 N.L.R.B. at 949 (over twenty years). As in the other two cases, the trouble began when the employer commenced negotiations for a new CBA by proposing to reduce wages and benefits dramatically below the levels set in the prior CBA. *See Nielsen,* 279 N.L.R.B. at 880 (employer proposed severe reductions in wages, overtime, health benefits, pay during layoffs, severance pay, shift premium rates, holiday pay, and job retraining benefits); *Concrete Pipe and Products,* 305 N.L.R.B. at 156–57 (employer proposed "steep cuts in wages" and severe reductions in holidays, vacations, overtime pay, breaks, and medical coverage); *ConAgra,* 321 N.L.R.B. at 950 (employer proposed to cut hourly wages from $17.84 to $11.11). In each of the three cases, the employers' representatives informed the union that the companies were profitable, but claimed that wage concessions were necessary in order to protect and improve their ability to compete. *See Nielsen,* 279 N.L.R.B. at 879; *Concrete Pipe and Products,* 305 N.L.R.B. at 152–53; *ConAgra,* 321 N.L.R.B. at 950–51. In the case before us, the Board leaned heavily on precise statements to this effect made by ConAgra's representatives, including: "If we do not take immediate measures there are probabilities we will not be here in the future," "I have seen the Company's decline during the last four years ... [T]he situation

derived principles that the Board explicitly adopted in its second *Nielsen* decision. *See Nielsen,* 305 N.L.R.B. at 700 n. 9.

**6.** The Board's dissenting member disagreed with the majority's conclusion that Molinos was obligated to turn over the financial information re-

quested by the Union; in his view, the statements made by Molinos' representatives could not, consistently with the Board's *Nielsen* decision, be treated as assertions of an "inability to pay." *See ConAgra,* 321 N.L.R.B. at 947 (Member Cohen, dissenting in part).

is serious and fragile ... [I]f we are not competitive we cannot survive ... We must do something to be able to survive," and "[T]hings like [the provision requiring that employees be provided with soap] are what makes us not be competitive and can make us have to close shop because we cannot compete." *ConAgra,* 321 N.L.R.B. at 944, 955. We can discern no principled distinction between these statements and those the Board found insufficient to trigger a disclosure obligation in *Nielsen* and *Concrete Pipe and Products;* indeed, some of the employers' statements in those cases seem *more* alarmist than their counterparts in this case. *See Nielsen,* 279 N.L.R.B. at 879 ("[W]e simply cannot compete ....."; "To survive we must be able to compete. Our business and our employees' jobs are at stake if we cannot!"; "It is *your* job that is on the line."); *Concrete Pipe and Products,* 305 N.L.R.B. at 152 ("[T]here has been intense competition from several concrete pipe producers ... Consequently it is imperative that we considerably lower our labor costs ... To survive in today's market we have got to be able to be competitive, and to be competitive, wage rates and benefits must be lowered.").

The Board here also relied upon statements by Molinos' representatives to the effect that ConAgra was considering bypassing Molinos by shipping already-milled flour to Puerto Rico, that the animal feed portion of Molinos' operations was losing money and that the flour portion was losing sales volume, and upon Molinos' announcement, issued after the negotiations broke down, of its intention to lay off forty employees. *See ConAgra,* 321 N.L.R.B. at 944, 955. These statements similarly fail to separate this case meaningfully from *Nielsen* or *Concrete Pipe and Products. See Nielsen,* 279 N.L.R.B. at 879 ("If we don't [become more competitive] the recent trend of losing even greater amounts of work to other companies will continue...."); *Concrete Pipe and Products,* 305 N.L.R.B. at 152 ("Our business is suffering a declining market due to the many new competitive products...."). None of these statements can reasonably be interpreted as assertions that Molinos was unable to pay the wages demanded by the Union over the term of the CBA under negotiation.

Molinos never suggested that the reason ConAgra was considering shipping already-milled flour to Puerto Rico was its belief that Molinos would be unable to pay the wages demanded by the Union, nor did Molinos' representatives state or even imply that the loss of sales in Molinos' animal feed operations would lead to any such immediate inability to pay the requested wages. Nor does the company's announcement of an intention to lay off forty employees after the expiration of the existing CBA amount to a claim that it could not afford to pay those employees the wages demanded by the Union.

Despite what we see as a neat fit between the record in this case and the *Nielsen* decision, the Board concluded that this case more closely resembled *The Shell Company,* 313 N.L.R.B. 133 (1993), a post-*Nielsen* case wherein the Board found that an obligation to turn over financial information on demand was created by an employer's statements and conduct. *See ConAgra,* 321 N.L.R.B. at 944, 955. Setting aside the question of whether *Shell* itself is impossible to reconcile with *Nielsen,* we find the Board's comparison of *ConAgra* with *Shell* baffling—in *Shell,* the Board explicitly distinguished *Nielsen* on the ground that Nielsen's bargaining representative had "repeatedly stated that it was still making a profit." *Shell,* 313 N.L.R.B. at 133. Molinos' representatives similarly stated repeatedly that the company remained profitable, beginning with the first negotiation session, *see* D.A. at 103, 286, 954, 1120; *id.* at 1037 ("[F]or years, we have been able to enjoy some good profits from [Molinos] and even today the Company continues to earn profits ....."); *id.* at 1038 ("[A]t present, Molinos is making money even though we are l[o]sing money in the feed business. Molinos as a company is making money."); *id.* at 1039, and the Union's representatives clearly understood that Molinos continued to be profitable. *See id.* at 103, 265, 286, 1001.

■ Thus, because it is "axiomatic that an agency adjudication must either be consistent with prior adjudications or offer a reasoned basis for its departure from precedent," *Kelley v. FERC,* 96 F.3d 1482, 1489 (D.C.Cir.1996), and because the Board's finding that Molinos and ConAgra violated the

**1444**

Act by refusing to turn over all of the information requested by the Union rests on an unexplained (indeed an unacknowledged) departure from the Board's precedent in *Nielsen* and other decisions, we will not enforce the portions of the order that rest upon that finding.

B. *Molinos' Alleged "Surface Bargaining"*

■ When labor negotiations have reached an "impasse" or "deadlock," an employer's unilateral changes in working conditions do not necessarily violate the Act, as they generally do in the absence of an impasse. *See American Fed'n of Television and Radio Artists v. NLRB*, 395 F.2d 622, 624 (D.C.Cir.1968). Predictably, unscrupulous employers can exploit this rule by sabotaging the negotiations to manufacture an impasse while making a show of negotiating in good faith; this practice is referred to as "surface bargaining." *See* 48 AM. JUR.2d *Labor and Labor Relations* § 2358 (1994). Using its authority "to order the cessation of behavior which is in effect a refusal to negotiate, or which directly obstructs or inhibits the actual process of discussion, or which reflects a cast of mind against reaching an agreement," *NLRB v. Katz*, 369 U.S. 736, 747, 82 S.Ct. 1107, 1114, 8 L.Ed.2d 230 (1962), the Board treats "surface bargaining" as a violation of § 8(a)(5) of the Act. *See, e.g., Horsehead Resource Dev. Co.*, 321 N.L.R.B. 1404, 1407 (1996). The touchstone for determining whether a genuine "impasse" or "deadlock" existed at the time the employer instituted unilateral changes is the absence of any realistic possibility that continuation of the negotiations would have been fruitful. *See Taft Broadcasting Co.*, 163 N.L.R.B. 475, 478 (1967); *petition for review denied, American Fed'n of Television and Radio Artists, supra.*

The ALJ in the case at bar concluded that Molinos entered these negotiations with a "predetermined resolve not to budge" from its initial position, and that Molinos engaged in "surface bargaining" and manufactured an impasse. *ConAgra*, 321 N.L.R.B. at 958.

She relied heavily for this conclusion on the contents of a "Contingency Plan" that ConAgra sent to Molinos prior to the beginning of the negotiations; in her view, the Contingency Plan "reveal[ed] that [Molinos] prepared [its] bargaining proposals knowing they would be so unacceptable as to ensure rejection by the Union, leading to an impasse followed by a strike." *Id.* She also rested this conclusion on her findings that Molinos presented the Union with "predictably unacceptable" proposals, merely "went through the motions" of bargaining, withheld from the Union information that it was obligated by the Act to turn over upon demand, arranged for improved security and replacement workers in anticipation of a strike, and "hastily" declared an impasse while the Union continued to offer compromises. *Id.* at 960, 962. The Board agreed with the ALJ's analysis and adopted her finding. *See id.* at 945.[7]

■ We think the Board's conclusion that Molinos engaged in "surface bargaining" is not supported by substantial evidence in the record. The Contingency Plan is certainly evidence that ConAgra and Molinos thought it likely that the Union would resist the proposed concessions vigorously, but preparing for a possible breakdown of negotiations is quite different from intentionally causing one. Fairly read, the Contingency Plan is not subject to the inference that ConAgra or Molinos *wanted* to create an impasse and force the union to strike. Rather, the plan simply shows that ConAgra made a judgment that the Union was likely steadfastly to resist any attempt to cut wages below their existing levels; ConAgra and Molinos were entitled to act on this judgment by preparing for the possibility that the Union's resistance would be strong and persistent enough to deadlock the negotiations and cause a strike. This same principle applies to Molinos' security improvements and arrangements for hiring replacement workers, which the ALJ treated as "Additional Evidence of Bad-Faith Bargaining." *Id.* at 960 (emphasis re-

---

**7.** The dissenting member rejected this finding, arguing that the majority had improperly used its subjective judgments regarding the substance of the employer's proposals to find bad-faith bargaining where the record showed only lawful "hard" bargaining. *Id.* at 946–47 (Member Cohen, dissenting in part).

moved). Molinos no doubt took these actions in "anticipation" of a strike, *id.*, but it does not follow that the actions constitute evidence that Molinos intended to bring about the "anticipated" strike.

With the Contingency Plan as a "smoking gun" removed from the mix, the evidence of Molinos' alleged "surface bargaining" is impermissibly weak. Molinos' bargaining proposals were predictably a hard sell, but not so unreasonable as to have been predictably *unacceptable*; Molinos proposed to reduce wages and benefits significantly below their existing levels, but not below the levels at several of Molinos' competitors—including competitors represented by the same union. *See* D.A. at 1137. Nor did Molinos categorically refuse to alter its proposals as the negotiations continued: One week after the parties began discussing the economic proposals, Molinos increased its proposed wages and benefits; two weeks later, Molinos improved its proposed medical coverage. When these modifications failed to advance the negotiations, Molinos suggested that the parties turn to mediation; the Union refused to do so. *See id.* at 1021. The Board also counted Molinos' refusal to provide some of the financial information requested by the Union as evidence of Molinos' bad faith. We have already explained, *see supra* Part II.A., why Molinos' refusal to turn over all of the requested information did not constitute a violation of the Act in itself, but this holding does not automatically render Molinos' conduct in regard to the information request irrelevant to Molinos' alleged "surface bargaining." However, the record indicates that Molinos did not attempt to use the issue of the information request to deadlock the negotiations; to the contrary, Molinos sought to defuse the issue by repeatedly pointing out that it was not claiming an "inability to pay"

the wages sought by the Union, and seeking an explanation of the information's relevance to the negotiations. Finally, the Board agreed with the ALJ's judgment that Molinos had "hastily" declared an impasse even as the Union continued to display sufficient flexibility to negate the existence of a genuine impasse. *ConAgra*, 321 N.L.R.B. at 945, 962. But Molinos' announcement that it believed the parties had reached an impasse came only after the parties' irreconcilable differences had become incontrovertible in numerous fruitless sessions: Molinos was determined to lower wages and benefits below their existing levels, while the Union was determined to increase them above their existing levels. Nor did the proposal made by the Union after Molinos' declaration of an impasse cast any doubt on Molinos' conclusion that further negotiations would fail to close the persistent gap between the parties' proposals—in it, the Union continued to press for increases in wages and benefits. *See* D.A. at 826.

Because the Board's finding that Molinos engaged in "surface bargaining" was not supported by substantial evidence in the record, we deny enforcement of those portions of the Board's order that rest on this finding.[8]

## C. Findings Uncontested by ConAgra

The Board asks this court for "summary enforcement" of two of its findings that ConAgra has not directly addressed in this appeal. Brief for the NLRB at 20. First, the Board correctly asserts that ConAgra does not separately contest the Board's finding that a ConAgra executive violated the Act by seeking to make the Union's withdrawal of an unfair labor practice charge a *quid pro quo* for ConAgra's provision of in-

---

**8.** Since the parties had reached a *bona fide* impasse, Molinos' lockout of the Union employees did not violate the employees' collective bargaining rights. *See American Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965). The ALJ found that Molinos' refusal to abide by the terms of the CBA subsequent to its scheduled termination was unlawful, both because there was no genuine impasse and because the CBA provided that it would extend for an additional year unless either party indicated in writing its desire to modify the agreement, and

that it would extend indefinitely for as long as the parties were negotiating a new agreement. *ConAgra*, 321 N.L.R.B. at 962–63. But the negotiations between Molinos and the Union, including both parties' written proposals exchanged during these negotiations, clearly satisfies the requirement regarding a written intent to modify the agreement, and the fact that the parties reached an impasse in negotiating a new agreement prevented the automatic extension clause of the agreement from taking effect.

formation requested by the Union. *See ConAgra,* 321 N.L.R.B. at 946, 957; Brief for the NLRB at 20. However, ConAgra may have operated under the assumption that, by knocking down the Board's finding that it was obliged by the Act to provide the financial information requested by the Union, it would automatically bring down the *quid pro quo* finding as well. Perhaps the Board can demonstrate that there is no such interdependence between these two findings, for example because the attempt to "bribe" a union into withdrawing an unfair labor practice charge violates the Act even if the incentive offered is something to which the union is not entitled under the Act. We cannot tell whether this is so, however, because the Board failed to accompany its finding regarding the *quid pro quo* offer with any citations or other explanation of how this action violated the Act. *See ConAgra,* 321 N.L.R.B. at 957 ("Without a doubt, [the ConAgra executive] made the delivery of information the quid pro quo for the Union's withdrawing its unfair labor practice charge. Little more needs to be said to support the conclusion that [ConAgra thereby violated §§ 8(a)(1) and 8(a)(5) of the Act]."). The Board offers one of its own decisions in support of this finding in its brief, *see* Brief for the NLRB at 20 (citing *Winges Co.,* 263 N.L.R.B. 152, 155 (1982)), but this decision does not address the question of whether a *quid pro quo* offer is illegal when the offeree is not legally entitled to the information that would be turned over under the deal. *See Winges,* 263 N.L.R.B. at 155 (respondent was "obligated to furnish [the information offered as part of the *quid pro quo*] under the law."). Therefore, we decline to grant enforcement of the portion of the order based upon this finding, and we remand the matter so that the Board may consider whether this finding of illegality may stand despite our rejection of the finding that the Union was entitled by the Act to receive the requested financial information.

Second, ConAgra's full argument contesting the Board's finding that it and Molinos were "joint employers," *see ConAgra,* 321 N.L.R.B. at 945, 964, reads as follows: "Molinos and ConAgra are not joint employers."

Final Brief of Petitioners at 43. Unlike its failure to counter the *quid pro quo* finding, we cannot write off this failure to contest a Board finding to the possibility that ConAgra assumed the finding was dependent upon other findings which it did contest: The "joint employer" finding quite clearly rests on facts relating to the authority that ConAgra exercises over Molinos, and not to any separate unfair labor practice finding. *See ConAgra,* 321 N.L.R.B. at 964. Furthermore, the Board offered several citations and explanations supporting this finding, which gave ConAgra notice that this finding was not dependent upon the Board findings that ConAgra did contest. *See id.* Thus, although we cannot grant enforcement of a "joint employer" finding detached from any separate unfair labor practice, we deem ConAgra to have waived any argument that it and Molinos are not "joint employers."

Accordingly, we remand the matter to the Board for its reconsideration of the *quid pro quo* finding, in light of our disagreement with the Board's finding that the Union was entitled by the Act to receive the information offered as part of the *quid pro quo.*

## III. Conclusion

We decline to enforce the Board's order because the Board's finding that Molinos violated §§ 8(a)(5) and 8(a)(1) of the Act by failing to turn over all of the financial information requested by the Union constituted an unexplained departure from the Board's precedent, and because the Board's finding that Molinos violated §§ 8(a)(5) and 8(a)(1) of the Act by engaging in "surface bargaining," and that Molinos violated §§ 8(a)(1), 8(a)(3), and 8(a)(5) of the Act by locking out employees represented by the Union and otherwise unilaterally altering the terms and conditions of employment, were not supported by substantial evidence in the record. We remand the matter to the Board for its reconsideration of the finding that ConAgra unlawfully sought to condition the provision of information to the Union on the Union's withdrawal of a charge brought against ConAgra under the Act, in light of our rejection of the

Board's finding that the Act required ConAgra to turn over this information.

*So ordered.*

WALD, Circuit Judge, concurring:

The panel today declines to enforce a Board order requiring financial disclosures from an employer, on the ground that it represented an unexplained departure from the Board's own precedent in *The Nielsen Lithographing Company,* 305 N.L.R.B. 697 (1991). *See supra* part II.A. This disposition is mandated by the "axiom[ ]" that agencies must either follow their own precedent or explain why they depart from it. *Kelley v. FERC,* 96 F.3d 1482, 1489 (D.C.Cir.1996). I write separately to voice my belief that there are sufficiently serious theoretical and practical fissures in the *Nielsen* reasoning itself that the Board should revisit it with an eye to its consistency with the purposes of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* ("the Act").

The Supreme Court's decision in *NLRB v. Truitt Manufacturing Company,* 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956), affirming a Board finding that it is an unfair labor practice for an employer to refuse to substantiate a claim that it cannot meet union bargaining demands because of its poor economic circumstances, dealt with "[o]ne of the most delicate tasks of our labor policy"— ensuring that employers and unions discharge their statutory duty to bargain in good faith. James A. Gross *et al., Good Faith in Labor Negotiations: Tests and Remedies,* 53 CORNELL L.REV. 1009, 1009 (1968). Among the factors complicating this task are the "difficulty of policing a subjective state of mind," *id.,* and the tension between the government's twin objectives of ensuring effective collective bargaining and refraining from unduly restricting the parties' negotiating tactics or requiring that negotiations result in particular outcomes. *See id.; see also* 29 U.S.C. § 158(d) ("[T]o bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith ... but such obligation does not compel either party to agree to a proposal or require the making of a concession....."). The Board's daunting task is to formulate rules governing the bargaining process that are clear enough to guide the participants in fulfilling their legal obligations, but which retain enough flexibility to enable the Board to ferret out bad-faith bargaining even when practiced in subtle ways. *See* Gross *et al., supra,* at 1010–11. As precarious an undertaking as it may be, overseeing the good faith of labor negotiations is essential to the goals of the Act, because an employer can destroy the bargaining status of a union "by going through the motions of negotiating almost as easily as by bluntly withholding recognition." Archibald Cox, *The Duty to Bargain in Good Faith,* 71 HARV. L.REV. 1401, 1413 (1958). The employer's duty to supply the union with information relevant to the employer's bargaining positions "epitomizes the basic issue concerning the meaning of good faith," *id.* at 1425, and has understandably preoccupied the Board from the Act's beginnings. *See Pioneer Pearl Button Co.,* 1 N.L.R.B. 837 (1936); *The Sherwin–Williams Co.,* 34 N.L.R.B. 651 (1941).

The Board's original attempts to distill from *Truitt* an essential insight into the nature of the good-faith inquiry for financial disclosure were commendable; my concern is with the Board's later *Nielsen* rule which, I think, extracts and applies the periphera of *Truitt,* rather than its core meaning. I conceive the essence of *Truitt* to be the principle that an employer displays a lack of good faith by making a claim purportedly based on objective economic data in the course of bargaining as to why it will not or cannot meet the union's demands, and then refusing to accede to the union's reasonable requests for information necessary to establish that the claim is made "honest[ly]," *Truitt,* 351 U.S. at 152, 76 S.Ct. at 755–56, and is "accura[te]," *id.* at 153, 76 S.Ct. at 756—*i.e.,* that the employer has not made the claim up out of whole cloth or out of an accidentally or intentionally self-serving misconstruction of relevant information in its possession.

The type of bad-faith negotiating that troubled the *Truitt* Court would be easily discernible in analogous situations outside of the collective bargaining context. For example,

if a prospective buyer of a house assures the house's owner that his bid is much more attractive than it might appear because a recent geological survey shows that the house sits on an earthquake fault, the buyer's refusal to turn over the survey upon request would intuitively cast doubt on his good faith, and introduce a strong suspicion that his claim was dishonestly made. The buyer knows that the owner needs the survey in order to appraise a crucial factual claim that he himself has introduced into the negotiations. If he refuses to turn it over, he forces the owner to make a "Hobson's choice" of the type described by then-Judge (now Chief Judge) Posner in *Nielsen Lithographing Company v. N.L.R.B.*, 854 F.2d 1063 (7th Cir.1988), indulging in the hope that the owner will be too risk-averse to play "Russian roulette" (as most of us are), and will simply assume that the buyer's representations are accurate and accept the offer. *See id.* at 1065.[9] Of course, an employer's refusal to turn over information in its possession might not constitute bad faith even when the information could assist the union in assessing the accuracy of the employer's bargaining positions, if the employer has a good-faith reason for refusing to turn it over. The Supreme Court and the Board have recognized that the duty to turn over relevant information upon request is not absolute, *see Detroit Edison Company v. NLRB*, 440 U.S. 301, 318, 99 S.Ct. 1123, 1132–33, 59 L.Ed.2d 333 (1979), and that an employer may legally refuse to accede to an information request for legitimate reasons, such as a need to keep the information out of the hands of its competitors or to protect the privacy of its employees. *See, e.g., Minnesota Mining & Mfg. Co.*, 261 N.L.R.B. 27 (1982). But if, as in *Truitt*, the employer denies the request based on an illegitimate reason or no reason at all, *see Truitt*, 351 U.S. at 150–51, 76 S.Ct.

at 754–55, the employer's bad faith seems evident.

The Board's *Nielsen* rule, however, permits employers to withhold financial information that would assist the union in evaluating the accuracy of the employer's negotiating claims for no reason at all, even when the accuracy of these claims is crucial to the union's choice of negotiating strategy and cannot be established without access to supporting financial information. The Board's dissenting Chairman in *Nielsen* pointed out that Nielsen had sought to explain the need for concessions from the union by making factual claims about its present economic condition, and concluded that under the *Truitt* principle Nielsen's refusal to turn over the information constituted bad faith. *See Nielsen*, 305 N.L.R.B. at 706–07 (Chairman Stephens, dissenting). The dissenting Chairman's construction of *Truitt* as encompassing a disclosure obligation whenever the employer makes factual claims the accuracy of which could be evaluated using information in the employer's possession is consistent with the Seventh Circuit's *Nielsen* opinion, *see id.* (citing *Nielsen*), and in my view the Board strayed from the "essential meaning" of *Truitt* in declining to extend it at least that far. *Nielsen*, 305 N.L.R.B. at 700.

Placing upon employers the obligation to supply the union, upon request, with financial information necessary to substantiate the employers' objectively verifiable negotiating claims would introduce a valuable measure of self-regulation into the collective bargaining process. Such a rule would give unions leverage to keep employers honest, mitigating the Board's need to police the employers' subjective state of mind. *See* Gross *et al.*, *supra*, at 1009; *cf. Truitt*, 351 U.S. at 152, 76 S.Ct. at 755–56 ("Good-faith bargaining necessarily requires that claims made by either

9. The "Russian roulette" situation does not exist in a wellfunctioning market, because the presence of alternative buyers enables the seller to reject an offer tainted by a prospective buyer's apparent bad-faith bargaining. But as the Supreme Court observed in *United Steelworkers v. Warrior & Gulf Navigation Company*, 363 U.S. 574, 580, 80 S.Ct. 1347, 1351–52, 4 L.Ed.2d 1409 (1960), no such option generally exists in the collective bargaining context, wherein the parties are under a "compulsion to deal with

one another, as opposed to dealing with other parties." Thus, although the type of bad-faith bargaining represented in the house-selling hypothetical is the same as that present in the collective bargaining context when a party refuses to turn over information, the *consequences* of that bad-faith bargaining differ in the two contexts; the prospective purchaser of a house would not be under any legal obligation to turn over information relevant to his bargaining claims.

bargainer should be honest claims."). It also would enable unions to correct assertions by employers that are honestly offered, but inaccurate. *Cf. Truitt*, 351 U.S. at 153, 76 S.Ct. at 756 ("If [an asserted inability to pay an increase in wages] is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy."). The *Nielsen* rule accomplishes these ends, but in too limited an arena—it extends only as far as the line separating claims of "competitive disadvantage" from claims of "inability to pay" during the term of the CBA. The rationale for this line set forth in the Seventh Circuit's decision in *NLRB v. Harvstone Manufacturing Corporation*, 785 F.2d 570, 577 (7th Cir. 1986), and accepted by the Board in its *Nielsen* decision, was that even an employer operating at a competitive disadvantage would "quite conceivabl[y]" be able to pay increased wages during the course of one CBA. But that rationale becomes shaky if the term of the CBA under negotiation is relatively long—as it was when the negotiations between the parties in this case began. *See* Deferred Appendix at 1155 (proposed CBA for a term of five years).

Adopting the theory of the dissenting Chairman in *Nielsen* would also correct an inaccurate assumption made by the *Nielsen* majority. The *Nielsen* majority's central premise is that an employer's claim of economic difficulties or competitive disadvantage is, for all practical purposes, identical to an unadorned refusal to pay what the union proposes. *See Nielsen*, 305 N.L.R.B. at 700 ("[T]he employer who claims only economic difficulties or business losses or the prospect of layoffs is simply saying that it does not want to pay."). In fact, these two types of claims are fundamentally different, and the difference is crucial to the bargaining process. Whereas an employer's pure unwillingness to pay is verified simply by the employer's statement to that effect, a claim of pending competitive ruin generally requires some external verification before a union can reasonably rely upon it in deciding how to structure its negotiating strategy. Experience demonstrates that unions may well decide to modify their proposals in the face of the employer's verified claims of economic

hardship or competitive disadvantage. Unions frequently put job security at the top of their negotiating agendas, *see, e.g.,* Michael H. Cimini, *Labor-management bargaining in 1995,* MONTHLY LAB. REV., Jan./Feb.1996 at 32, and may seek to further this interest by lowering their wage demands in order to buy an increase in the employer's long-term ability to provide jobs. A union might also seek increased linkages between employee compensation and the profitability of the company in return for reducing its hourly wage demands. *See id.* at 38 ("[S]everal airlines asked their unions to agree to wage and benefit concessions ... The unions wanted something in return for those concessions—stock in the carriers, a greater voice in how the airlines are run, and improved job security."); *id.* at 39 ("Delta asked the pilots union ... to make wage and productivity concessions. The union said it would agree to terms if Delta gave it concessions in return—a representative on the airline's board of directors, stock options, profit sharing ...."); *see also Compensation is Increasingly Linked to Corporate Profits, NAM President Says,* Daily Lab. Rep. (BNA), Apr. 18, 1997, at A–9 ("Corporations are increasingly tying compensation to business profits as hourly wages increasingly account fora smaller share of compensation...."); EDWARD COHEN-ROSENTHAL & CYNTHIA E. BURTON, MUTUAL GAINS: A GUIDE TO UNION-MANAGEMENT COOPERATION 253–60 (2d ed.1993); *IBEW Local Reaches Tentative Agreement with L.A. Department of Water and Power,* Daily Lab. Rep. (BNA), June 19, 1996, at A–9. But absent the information necessary to ascertain whether the employer's claims of financial hardship or competitive disadvantage are accurate, the union must guess at whether such a course truly represents the best interests of its constituents. In this sense it faces the same "Hobson's choice" that obtains when the employer makes an unsupported "plea of poverty."

I believe that the Board's *Nielsen* rule has weakened the "gravitational field of *Truitt*" too severely for that opinion to retain its vitality, *Nielsen*, 854 F.2d at 1067, and hope that the Board will see fit to reexamine its *Nielsen* rule in the near future, and adopt an

alternative more consistent with the spirit of *Truitt* and the purposes of the Act.